**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

QSOFT CONSULTING, LIMITED )
)
      Plaintiff, )
)
      v. )    C.A. No. 07-_____-(____)
)
TEDDY TONG and TDTONG LTD. )
)
      Defendants. )

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**QSOFT CONSULTING LIMITED'S MOTION FOR PRELIMINARY RELIEF**

**GREENBERG TRAURIG, LLP**
Donald J. Detweiler (I.D. #3087)
Sandra G. M. Selzer (I.D. # 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
302-661-7000
*detweilerd@gtlaw.com*

*Attorneys for Plaintiff, QSoft Consulting Limited*

**GREENBERG TRAURIG, LLP**
Paul D. McGrady
Anthony L. Abboud
Paul A. Del Aguila
Jason B. Elster
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
312 456-8400

Dated: Wilmington, Delaware
      June 19, 2007

## TABLE OF CONTENTS

STATEMENT OF CASE ........................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................. 2

STATEMENT OF FACTS .................................................................................... 3

      A.     QSoft's Online Presence ...................................................................3

      B.     QSoft's Gaydar Website Membership Terms And Conditions ..................5

      C.     Teddy Tong's Spam ........................................................................6

      D.     Tong's Violations of QSoft's Membership Contract ..................................8

ARGUMENT ........................................................................................................ 8

      A.     Legal Standard For Granting A Preliminary Injunction .............................8

      B.     QSoft Is Likely To Succeed On The Merits Of Its Claims Under The CAN-SPAM Act .................................................................................9

      C.     QSoft Is Likely To Succeed On Its Claim Under The ACPA ..................13

            1.     GAYDAR Is A Distinctive And Famous Mark Entitled To Protection ....................................................................14

            2.     Defendants' Infringing Domain Names Are Confusingly Similar To QSoft's GAYDAR Mark .............................................15

            3.     Defendants Registered The Infringing Domain Names With The Bad Faith Intent To Profit From Them. ..................................17

      D.     QSoft Will Be Irreparably Harmed If Preliminary Injunctive Relief Is Not Granted. ..........................................................................................19

      E.     Granting Preliminary Relief Will Not Result In Harm To Defendants ..........................................................................................21

      F.     Preliminary Relief Enjoining And Preventing Spam Is In The Public Interest .................................................................................................22

CONCLUSION .................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Allegheny Energy, Inc. v. DQE, Inc.,*
    171 F.3d 153 (3d Cir. 1999).................................................................................. 9

*Coca-Cola Co. v. Purdy,*
    382 F.3d 774 (8th Cir. 2004) ...................................................................... passim

*Estate of Presley v. Russen,*
    513 F.Supp. 1339 (D.N.J. 1981) .......................................................................... 23

*Freedom Calls Found. v. Bukstel,*
    No. 05-CV-5460, 2006 WL 2620648 (E.D.N.Y. Sept. 12, 2006) ........................ 20

*FTC v. Phoenix Avatar, LLC,*
    No 04 C 2897, 2004 WL 1746698 (N.D. Ill. July 30, 2004) ................................ 22

*Her, Inc. v. Re/Max First Choice, LLC,*
    468 F.Supp.2d 964 (S.D. Ohio 2007) .................................................................. 16

*Hotmail Corp. v. Van$ Money Pie Inc.,*
    47 U.S.P.Q. 2d 1020 (N.D. Cal. 1998) ................................................................ 20

*Hypertouch, Inc. v. Kennedy-Western Univ.,*
    No. C 04-05203 SI, 2006 U.S. Dist. LEXIS 14673 (N.D. Cal. March 8, 2006)..... 9

*Kos Pharmaceuticals, Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004)..................................................................... 9, 20, 21

*MySpace, Inc. v. The Globe.com, Inc.,*
    No. CV 06-3391-RGK(JCx) C.D. Cal. February 27, 2997) ................................... 9

*Northern Light Technology v. Northern Lights Club,*
    97 F. Supp. 2d 96 (D. Mass. 2000) .....................................................................15

*Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharm. Co.,*
    290 F.3d 578 (3d Cir. 2002)......................................................................... 21, 22

*Opticians Ass'n v. Indep. Opticians,*
    920 F.3d 187 (3d Cir. 1990)................................................................................ 23

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,*
    143 F.3d 800 (3d Cir. 1998).................................................................................19

*Shields v. Zuccarini,*
254 F.3d 476 (3d Cir. 2001)...........................................................................passim

*Victoria's Secret Stores v. Artco Equipment Co., Inc.,*
194 F. Supp. 2d 704 (S.D. Ohio 2002) ........................................................... 18, 19

*White Buffalo Ventures, LLC v. University of Texas,*
420 F.3d 366 (5th Cir. 2005) ................................................................................. 9

**State Cases**

*Joffe v. Acacia Mortgage Corp.,*
211 Ariz. 325 (Ariz. Ct. App. 2005) ................................................................... 10

**Statutes**

15 U.S.C. § 1125........................................................................................... 13, 14, 17

15 U.S.C. § 7701........................................................................................... 11, 22

15 U.S.C. § 7704(a)(1)................................................................................. 9, 10, 11

15 U.S.C. § 7706(g) ............................................................................................... 9

47 U.S.C. § 231(e)(4)............................................................................................. 9

**Other Authorities**

BLACK'S LAW DICTIONARY 1164 (8th ed. 2004)................................................... 11

Rules and Regulations Implementing the CAN-SPAM Act of 2003 and the TCPA,
69 FR 55765-01, 19 FCC Rcd. 15927, 15933, ¶ 16, 2004 WL 1794922 (2004).. 10

## STATEMENT OF CASE

Plaintiff QSoft Consulting Limited ("Plaintiff" or "QSoft") is the world's leading provider of online gay and lesbian oriented services. QSoft owns and operates several online communities where QSoft members can meet, chat, and access other Internet-based services. In November 2006, QSoft began receiving complaints from its members about being targeted by recurring, unsolicited commercial messages promoting websites that not only offer services in direct competition with QSoft's online services, but that also infringe on QSoft's protected GAYDAR mark. The competing and infringing websites are all registered to Teddy Tong (individually, "Tong") and tdtong ltd. (collectively, "Defendants").

Concurrently herewith, QSoft filed its Complaint against Defendants seeking relief under the federal Controlling the Assault of Non-Solicited Pornography and Marketing Act, 15 U.S.C. § 7701 et seq (the "CAN-SPAM Act"), the Computer Fraud and Abuse Act 18 U.S.C. § 1020 et seq, the Anticybersquatting Consumer Protection Act 15 U.S.C. § 1125 ("ACPA"), Section 43(c) of the Lanham Act 15 U.S.C. § 1125, Delaware's Deceptive Trade Practice Act, 6 Del. C. § 2531 et seq, and also asserting common law trespass to chattel and breach of contract claims.[1]

Plaintiff's lawsuit is necessary to protect its customers from Defendants' ongoing transmission of unsolicited commercial text messages that promote pornography and services in direct competition with QSoft, as well as Defendants' acts of cybersquatting. Moreover, Defendants' actions are causing immediate harm to QSoft and QSoft's members. The unsolicited commercial messages, which began in November 2006, are

---

[1] This Motion is limited to QSoft's claims for violations of the CAN-SPAM Act and the ACPA.

**still** being sent to QSoft members despite QSoft's requests, on two occasions, to cease and desist from such activities. As fully addressed below, QSoft is entitled to preliminary relief under the federal CAN-SPAM Act and the ACPA.

## SUMMARY OF ARGUMENT

QSoft seeks injunctive relief to 1) enjoin Defendants from spamming QSoft customers with unsolicited commercial messages and 2) enjoin Defendants' infringing use of QSoft's protected marks through acts of cybersquatting by transferring the infringing domain names to QSoft.

Defendants have violated CAN-SPAM by transmitting the type of messages expressly prohibited by the CAN-SPAM Act. Specifically, Defendants sent unsolicited commercial messages to QSoft members that contained false and misleading information and lacked statutorily required opt-out information. Additionally, Defendants continued to send the unsolicited commercial messages even after they were twice instructed by QSoft to cease and desist such activity.

Defendants also have violated ACPA by registering domain names that are confusingly similar to the QSoft's famous and distinctive trademark, GAYDAR, and QSoft's corresponding GAYDAR websites, with the bad faith intent to profit from the infringing domain names. For example, Defendants registered and used infringing domain names <gaydarguyz.com>, <gaydarboys.net>, and <gaydarcams.net>. Because these domain names incorporate QSoft's protected GAYDAR mark in its entirety, they are confusingly similar to QSoft's famous and distinctive GAYDAR mark and are therefore being maintained in violation of ACPA.

In order to address Defendants' continuing violations of the CAN-SPAM Act and the ACPA, QSoft is seeking two forms of preliminary injunctive relief. *First*, QSoft requests an order enjoining Defendants from continuing their ongoing spamming attack on QSoft's customers. *Second*, QSoft requests an order enjoining Defendants from continuing to use the infringing domain names and an order transferring the infringing domain names to QSoft.

## STATEMENT OF FACTS

### A.    QSoft's Online Presence

QSoft, a private British corporation, is a technology company with a network of complimentary media brands that include the world's leading gay and lesbian dating websites and an online digital radio station. In May 1999, QSoft registered the domain name <gaydar.co.uk> and, in the process, adopted its GAYDAR mark and media brand. In 2001, QSoft applied to register GAYDAR as a trademark in the European Community, and on January 9, 2003, QSoft registered GAYDAR as a trademark in the European Community. Additionally, QSoft has extensive common law rights to its GAYDAR mark in the United States.

Since November 1999, QSoft has been extensively involved in the development of interactive services for the gay and lesbian community. That involvement includes supplying online dating services for the gay and lesbian community under the brand name and mark GAYDAR. QSoft's media brands and marks include GAYDAR, RAINBOW NETWORK, and the related URLs <gaydar.co.uk>, <gaydargirls.com>, <gaydarradio.com>, <rainbownetwork.com>, <gaydartravel.com>, <my-gaydar.com>, and <gaydarguys.com>, (collectively, the "GAYDAR websites"). QSoft began

registering the GAYDAR websites in 1998 and registered its most recent in 2005.[2] QSoft's network of websites serve more than 300 million page impressions per month to over three million registered and audited users. Of its three million registered and audited users, 409,026 are residents of the United States.

QSoft currently operates its online dating and chat line services through the domain names <gaydar.co.uk>, <gaydarguys.com>, and <gaydargirls.com>. QSoft has entered into an affiliate relationship with Cruz N'Cub Publishing Inc. ("Cruz") who directs web traffic to QSoft's <gaydar.co.uk> domain name via the <gaydar.net> domain name. QSoft operates its GAYDAR websites under the GAYDAR mark. Cruz operates the <gaydar.net> website under a license of the GAYDAR mark granted by QSoft.

The Internet-related services offered by QSoft on <gaydar.co.uk> include access to the GAYDAR websites, the ability to exchange electronic messages with other people who register an account with <gaydar.co.uk> ("Gaydar Members"), and other features such as chat rooms, content, or applications offered from time to time by QSoft in connection with <gaydar.co.uk>.

QSoft's online dating services business is advertised on its GAYDAR websites and corresponding domain names. Moreover, QSoft has engaged in extensive national and international advertising on the Internet, in newspapers, and on radio stations in the United States. During 2005, QSoft spent $124,145.00 in the United States advertising and promoting the GAYDAR brand and websites. Examples of QSoft's United States

---

[2]   QSoft registered the following primary GAYDAR websites on the following dates: <rainbownetwork.com> on February 6, 1998; <gaydar.co.uk> on May 15, 1999; <gaydarradio.com> on August 15, 2000; <gaydarshop.com> on December 20, 2000; <gaydargirls.com> on July 12, 2001; <my-gaydar.com> on September 19, 2001; <gaydardate.com> on September 21, 2002; <gaydarguys.com> on March 31, 2003; <gaydartravel.com> on February 13, 2004; <gaydarradio.co.uk> on June 9, 2004; and <gaydar.com.au> on October 26, 2005.

print advertisements are attached hereto as **Exhibit 1**. QSoft has also developed search engine optimization strategies to maximize its visibility on the Internet.

Over the years, QSoft has invested substantial amounts of money, creative energy, and time into developing, maintaining, and upgrading its GAYDAR websites and their associated services. QSoft personnel expend significant time and energy to minimize any disruption by indiscriminate and unauthorized mass mailings of unsolicited commercial email ("spam"). QSoft regulates its GAYDAR websites and services in part by strictly prohibiting the sending of spam through the GAYDAR websites.

**B.      QSoft's Gaydar Website Membership Terms And Conditions**

QSoft's prohibitions against unsolicited commercial messages, registration of multiple user accounts per individual, submission of false registration information, and promotion of other products or services are set forth in its contract with its members. QSoft's contract with Gaydar Members is referred to as the Gaydar Website Membership Terms and Conditions ("Membership Contact"). QSoft's current Membership Contract is publicly posted on its website and is available at http://gaydar.co.uk, a true and correct copy of which is attached hereto as **Exhibit 2**.

The Membership Contract specifically prohibits a Gaydar Member from, among other things, supplying false or inaccurate information to QSoft, having more than one account per member, and from advertising or promoting the user's or a third-party's products or services in any manner.[3] The Membership Contract also governs the use of the GAYDAR websites. In order to become a member of the GAYDAR websites, to

---

[3] While <gaydar.co.uk> hosts a commercial forum for Gaydar Members who are interested in commercial escort and masseuse services, promotion of any other commercial products or services is prohibited without a QSoft-issued commercial profile. A true and correct copy of QSoft's commercial profile requirements is attached hereto as **Exhibit 3**.

communicate with other Gaydar Members, and to make use of the services provided by QSoft, a user must agree to be bound by the MTC before being allowed to register for an account and become a Gaydar Member.

### C.     Teddy Tong's Spam

Upon information and belief, Defendants Teddy Tong and tdtong ltd. are residents of New Jersey, with a claimed address in Princeton, New Jersey, and are the registrants of record for the following domain names: <gaydarboys.net>, <gaydarcams.net>, <gaydarguyz.com>, and <myqaydar.com> (the "Infringing Domain Names"), each of which was registered through Estdomains Inc. In addition, Tong, claiming an address in San Francisco, California, is the registrant of record for <myrealjocks.com>, which was registered through GoDaddy.com. Printouts of public WHOIS records evidencing Defendants' unauthorized registration of the Infringing Domain Names AND <myrealjocks.com> are collectively attached as **Exhibit 4**.

On or about November 22, 2006, QSoft discovered that the Infringing Domain Names <gaydarboys.net>, <gaydarcams.net>, and <myqaydar.com> were linked to chat room messages sent from registered accounts on <gaydar.co.uk>. The <gaydar.co.uk> accounts at issue are registered to Tong. Tong has registered almost two hundred user names on <gardar.co.uk> including, among others, "speciallyexult" and "bargeincidence." Tong fraudulently created his <gaydar.co.uk> accounts for the specific purpose of sending unsolicited commercial messages to Gaydar Members.

Tong used his fraudulently created <gaydar.co.uk> accounts to transmit hundreds of unsolicited commercial messages to Gaydar Members via chat messages since November 22, 2006. Many of the unsolicited commercial messages Tong caused to be

transmitted to Gaydar Members were sent by an automated program commonly referred to as a "bot" and not a human being. The unsolicited commercial messages sent to Gaydar Members advertise the Defendants' Infringing Domain Names and corresponding websites by providing links to those websites. Tong's used the fraudulently created accounts to create the false impression that the spam messages came from other individual Gaydar Members rather than an individual or entity unaffiliated with QSoft. The unsolicited commercial messages do not identify themselves as advertisements, nor do they contain clear and conspicuous notice that a Gaydar Member has the opportunity to decline to receive messages from Tong. The unsolicited commercial messages also lack a valid physical address for Tong or tdtong ltd.

QSoft took immediate action to block Defendants' illegal activities, by among other things, sending Defendants a cease and desist letter on November 24, 2006, notifying them that the unsolicited commercial chat room messages were, and are, illegal, and warning that Defendants would be liable to QSoft for damages resulting therefrom. A copy of the November 2006 cease and desist letter is attached hereto as **Exhibit 5**. QSoft subsequently discovered that Tong registered <myrealjocks.com> with a different mailing address and through a different registrar. Following this discovery, QSoft sent Defendants a second cease and desist letter on May 18, 2007. A copy of the May 21, 2007 cease and desist letter is attached hereto as **Exhibit 6**.

Defendants are direct competitors of QSoft. QSoft provides advertising for a webcam service known as "CupidoCam." Tong is the owner of <gayhost.org>, which refers Internet traffic to <iFriends.net> and other competing adult oriented webcam "chat room" websites. Examples of the use of these domain names for this commercial

purpose are collectively attached hereto as **Exhibit 7**. Defendants are using the Infringing Domain Names for the promotion of online gay and lesbian oriented services that directly compete with QSoft and CupidoCam. Defendants are not affiliated with QSoft and, as a result, are not authorized to use the GAYDAR mark in any manner - in particular, they are not authorized to advertise a competing business.

### D.    Tong's Violations of QSoft's Membership Contract

Tong's unsolicited commercial chat room messages were sent in violation of QSoft's Membership Contract. Tong has continued to send unsolicited commercial messages even after receiving cease and desist letters from QSoft. The illegal commercial messages sent by Tong to Gaydar Members has caused QSoft to incur substantial bandwidth and delivery-related costs. QSoft has also been forced to devote its employees' time, money and resources to the problems caused by Tong's activities.

Defendants' wrongful acts have resulted in substantial and irreparable harm to QSoft in its reputation, loss of goodwill, loss of profits, employee costs, attorneys' fees, and other pecuniary damages. For instance, attached collectively as **Exhibit 8** are examples irate QSoft customers believing that the Spam messages were sent (or could have been sent) by QSoft or one its GAYDAR websites.

### ARGUMENT

### A.    Legal Standard For Granting A Preliminary Injunction

In the Third Circuit, "a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos*

*Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).  As explained below, QSoft is entitled to the requested preliminary injunctive relief under each of these factors.

**B.      QSoft Is Likely To Succeed On The Merits Of Its Claims Under The CAN-SPAM Act**

QSoft is likely to succeed on its CAN-SPAM Act claims since defendant's violations have been clear, repeated, and willful.  The CAN-SPAM Act authorizes a "provider of Internet access services" to maintain an action for injunctive relief and/or damages in federal court for, among other things, 1) a violation of the CAN-SPAM Act's prohibition against false or misleading header information and 2) any pattern or practice that violates the general requirements for sending unsolicited electronic messages.  *See* 15 U.S.C. §§ 7706(g); 7704(a)(1-5).  There is no question that QSoft is a provider of internet access services under the CAN-SPAM Act.[4]

Tong has repeatedly violated the CAN-SPAM Act's prohibition against initiating the transmission of false or misleading header information that accompanies, or is contained within, an electronic mail message.[5]  *See* 15 U.S.C. § 7704(a)(1).  Under the

---

[4] A provider of Internet access services is an entity that provides "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers."  Communications Act of 1934, 47 U.S.C. § 231(e)(4); s*ee* 15 U.S.C. § 7702(11) ("The term 'Internet access service' has the meaning given to that term in section 231(e)(4) of the Communications Act of 1934").  Courts have held that "a provider of e-mail service alone, without any other services, qualifies as an ISP."  *Hypertouch, Inc. v. Kennedy-Western Univ.*, No. C 04-05203 SI, 2006 U.S. Dist. LEXIS 14673, *9 (N.D. Cal. March 8, 2006); *see also*, *White Buffalo Ventures, LLC v. University of Texas*, 420 F.3d 366, 369 (5th Cir. 2005) (finding a school to be an Internet access service provider because of its provision of email addresses to faculty, staff, and students).  QSoft has standing to bring a claim under the CAN-SPAM Act because QSoft, in addition to providing a multitude of online services, is a provider of e-mail services and therefore a provider of Internet access services under the CAN-SPAM Act.

[5] As addressed in the unreported but exceedingly similar case *MySpace, Inc. v. The Globe.com, Inc.,* the CAN-SPAM Act applies to electronic messages at issue here.  *See MySpace, Inc. v. The Globe.com, Inc.,* No. CV 06-3391-RGK(JCx) at 4-5 (C.D. Cal. February 27, 2997); *see also CAN-SPAM Act*, 15 U.S.C. § 7702(2), (5-6) (defining commercial electronic mail messages); *Joffe v. Acacia Mortgage Corp.*, 211

Act, header information is materially misleading if, among other things, an email message contains or is accompanied by header information "that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations." 15 U.S.C. § 7704(a)(1)(A). Here, Tong used false or fraudulent pretenses to obtain access to the <gaydar.co.uk> accounts from which the many spam messages sent to QSoft customers originated.

In order to create the multiple <gaydar.co.uk> accounts used to send the spam messages, Tong clicked his acceptance of QSoft's Membership Contract. The Membership Contract prohibits a user from, among other things, supplying false or inaccurate information to QSoft, having more than one account per (guest) member, and advertising or promoting the user's or a third party's products or services. *See* **Exhibit 2**. Tong clicked his assent to QSoft's Membership Contract when he first created and registered a <gaydar.co.uk> account and each time thereafter when he created the nearly 200 accounts he registered with Gaydar - itself a violation of QSoft's Membership Contract - from which he proceeded to send hundreds of unsolicited commercial messages to Gaydar Members advertising competing websites and competing webcam services. Tong's acceptance of QSoft's Membership Contract and subsequent and continuing violation of its terms indicates that Tong obtained the multiple Gaydar accounts, which were used to spam Gaydar Members through false or fraudulent pretenses or representations in violation of § 7704(a)(1)(A) of the CAN-SPAM Act.

---

Ariz. 325 (Ariz. Ct. App. 2005) (applying the CAN-SPAM Act to computer-to-phone text messages); *Rules and Regulations Implementing the CAN-SPAM Act of 2003 and the TCPA,* 69 FR 55765-01, 19 FCC Rcd. 15927, 15933, ¶ 16, 2004 WL 1794922 (2004) (same). A true and correct copy of the opinion issued in *MySpace, Inc.*, is attached hereto as **Exhibit 9**.

In addition to its prohibition on false or misleading headers, the CAN-SPAM Act prohibits a "pattern or practice" of: transmitting a deceptive subject heading, § 7704(a)(2); sending commercial messages that do not contain clear and conspicuous identification that the message is an advertisement or solicitation and a clear and conspicuous return address that allows the recipient to opt-out of future messages, §§ 7704(a)(3), (5); and sending commercial messages to recipients after they have requested not to receive such messages from the sender, § 7704(a)(4). While the CAN-SPAM Act does not define a "pattern or practice" for purposes of §§ 7704(a)(2-5), "pattern" is defined in Black's Law Dictionary to mean "a mode of behavior or series of acts that are recognizably consistent." BLACK'S LAW DICTIONARY 1164 (8th ed. 2004). At a minimum, therefore, "pattern or practice" involves more than a single incident.

Here, Tong has engaged in a pattern or practice of creating nearly 200 false user accounts on the <gaydar.co.uk> website and has used these accounts to send hundreds of unsolicited commercial messages to Gaydar Members promoting competing websites such as <gayhost.org>, <gaydarboys.net>, <gaydarcams.net>, <myqaydar.com>, and <myrealjocks.com> in violation of the CAN-SPAM Act. These messages are likely to mislead Gaydar Members into thinking that QSoft or <gaydar.co.uk> authorizes, is affiliated with, endorses, or sponsors the infringing websites advertised in Tong's spam messages. Moreover, many of the spam messages Tong caused to be transmitted to Gaydar Members were sent by an automated program commonly referred to as a "bot" and not a human being. These messages misled Gaydar Members into believing that the message was initiated by a human being when in fact the message was sent by an

automated program.  For example, in response to an automated message initiated by Tong that reads "you seem like someone we'd like to chat with," the Gaydar Member's response "how do u know that" shows that he believed he was communicating with a human being.  *See* **Exhibit 8**.  Tong's pattern of initiating hundreds of misleading spam messages clearly violates § 7704(a)(2)'s prohibition on transmitting deceptive subject headings.  Thus, QSoft is likely to prevail on its claim that Defendants transmitted deceptive subject headings in violation of the CAN-SPAM Act. Moreover, in violation of § 7704(a)(4) of the CAN-SPAM Act, Tong continued to send these misleading spam messages to Gaydar Members after they requested not to receive any additional messages.  Because Tong's unsolicited and unwelcomed spam messages did not provide a way for Gaydar Members to request not to receive future messages (an opt-out option), QSoft, first on November 24, 2006 and again on May 18, 2007, instructed Tong to cease and desist his transmission of the spam messages.  *See* **Exhibits 5 and 6**.[6]  Despite being directed to cease his spamming attacks, Tong continued to send Gaydar Members unsolicited spam messages.  To date, Gaydar Members continue to receive unsolicited spam messages advertising Defendants' Infringing Domain Names and competing products and services.  For these reasons, QSoft is likely to prevail on its claim that Defendants' continued spamming attacks violated § 7704(a)(4) of the CAN-SPAM Act. Additionally, the CAN-SPAM Act requires that any commercial electronic mail include "clear and conspicuous identification that the message is an advertisement or solicitation," notice of the opportunity "to decline to receive further commercial electronic mail messages from the sender," and "a valid physical postal address of the

---

[6] Teddy Tong registered <myrealjocks.com> with the registrar GoDaddy.com using a different physical address than he used when registering the Infringing Domain Names with Estdomains Inc.

sender."  §§ 7704(a)(3), (5).  The spam messages transmitted by Tong do not contain any of the information required by the CAN-SPAM Act.  They do not identify themselves as advertisements on behalf of the various competing and infringing websites, nor do they contain clear and conspicuous notice of the Gaydar Member's opportunity to opt out or decline to receive further messages from Tong.  *See* **Exhibit 8**.  Further, they also lack a valid physical postal address for Defendants.  *See id.*  QSoft is therefore also likely to succeed on its claims against Defendants under any of these provisions of the CAN-SPAM Act.

Defendants' violations of the CAN-SPAM Act are egregious and are likely to be found as willful because they were perpetrated in violation of QSoft's MTC to which Tong assented before sending any of the spam messages.  In addition, Tong **continued** to send spam messages even after QSoft sent him two cease and desist letters.  By continuing to engage in the creation of multiple accounts for false and fraudulent purposes and continuing to send out unsolicited commercial email communications containing materially false or misleading information, Defendants have acted willfully and knowingly.

### C.    QSoft Is Likely To Succeed On Its Claim Under The ACPA

In 1999, Congress enacted the ACPA in order to prevent the misappropriation of trademarks by stopping conduct known as "cybersquatting."  The ACPA defines "cybersquatting" as registering or using  with a "'bad faith' intent to profit from an Internet domain name that is 'identical or confusingly similar' to the distinctive or famous trademark or internet domain name of another person or company."  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (quoting 15 U.S.C. § 1125(d)).  QSoft is

likely to succeed on the merits of its claim because it can establish that: 1) GAYDAR is a distinctive or famous mark entitled to protection; 2) Defendants' domain names are identical or confusingly similar to QSoft's GAYDAR mark; and 3) Defendants registered the domain names with the bad intent to profit from them. *Id.* at 482 (citations omitted).

> ### 1.  *GAYDAR Is A Distinctive And Famous Mark Entitled To Protection.*

The GAYDAR mark is both "distinctive" and "famous" and, therefore, entitled to protection under the ACPA.  In evaluating this element, the following factors may be considered:

> (A)  the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of the use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties.

*Shields*, 254 F.3d at 482 (citing 15 U.S.C. § 1125(c)(1)).  A review of these factors clearly establishes that QSoft's GAYDAR mark is both distinctive and famous.

In May 1999, QSoft registered the domain name <gaydar.co.uk> and, in the process, adopted the GAYDAR mark.  Also in 1999, QSoft extensively developed its interactive services for the gay and lesbian community, by creating and supplying online dating services for the gay and lesbian community under the GAYDAR mark and brand name.  To this day, QSoft continues to provide these, and other online interactive services, for the gay and lesbian community under the GAYDAR mark and brand name and through its GAYDAR websites.

QSoft's network of GAYDAR websites serve more than **300 million** page impressions per month to over **three million** registered and audited users. (*See* Verified Complaint at ¶ 15.)  The GAYDAR websites thus give GAYDAR a global presence.  Of the three million registered and audited users, over 400,000 are residents of the United States. (*See id*. at ¶ 16.)  Over the years, QSoft has invested substantial amounts of time, creative energy, and money in developing, promoting and maintaining its GAYDAR mark and its GAYDAR websites.  QSoft has engaged in extensive national and international advertising on the Internet, in newspapers, and on radio stations, to promote the GAYDAR mark and the GAYDAR websites.  In 2005, QSoft spent $124,145.00 in advertising the GAYDAR name and GAYDAR websites in the United States alone. (*See id*. at ¶ 37.)  As a result of QSoft's substantial efforts and investments, the GAYDAR mark has come to represent QSoft's goodwill and recognition as a leading source of online gay and lesbian dating services and has become one of the biggest and most recognized names in the global gay and lesbian marketplace.  Accordingly, the GAYDAR mark is undoubtedly a famous and distinctive mark entitled to protection.  *See Shields*, 254 F.3d at 482-83 (finding mark entitled to protection where corresponding website received "in excess of 700,000 visits per month").

> ### 2. *Defendants' Infringing Domain Names Are Confusingly Similar To QSoft's GAYDAR Mark.*

In determining whether Defendants' Infringing Domain Names are confusingly similar to, or in the case of famous marks, dilutive of, QSoft's GAYDAR mark, the Court is to make a "direct comparison between the protected mark and the domain name itself." *Northern Light Technology v. Northern Lights Club*, 97 F. Supp. 2d 96, 117 (D. Mass. 2000); *see also Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004) ("It is the

challenged domain name and the plaintiff's mark which are to be compared."). The question under the ACPA is therefore not whether Defendants' Infringing Domain Names are likely to be confused with QSoft's *domain name*, but whether they are identical or confusingly similar to QSoft's protected marks. *See Coca-Cola*, 382 F.3d at 783.

Defendants' Infringing Domain Names, <gaydarboys.net>, <gaydarcams.net>, <gaydarguyz.com>, and <myqaydar.com>, all incorporate the GAYDAR mark in their domain names. Defendants' use of "gaydar" in their Infringing Domain Names is clearly confusing as it creates the appearance that QSoft has permitted the use of the GAYDAR mark by the Defendants. *See Her, Inc. v. Re/Max First Choice, LLC*, 468 F.Supp.2d 964, 973 (S.D. Ohio 2007) (use of plaintiff's mark in defendant's domain name held to be clearly confusing as it created the appearance that plaintiff permitted the use of the mark). Moreover, Defendants' Infringing Domain Names are either virtually identical to a GAYDAR website, *compare* Defendants' <gaydarguyz.com> *with* QSoft's <gaydarguys.com>, or only differ from QSoft's GAYDAR mark and the GAYDAR websites by the addition of generic terms such as "my," "boys," or "cams." The strong similarity between Defendants' Infringing second level[7] Domain Names and QSoft's second level domain names can only lead to one conclusion - Defendants' Infringing Domain Names are confusingly similar to QSoft's GAYDAR mark and GAYDAR websites. *See Coca-Cola*, 38 F.3d at 783-784; *Shields*, 254 F.3d at 483.

---

[7] A domain name typically consists of a top level extension, such as .com, .org, or .net, and a second level domain name, such as google in google.com. *Coca-Cola*, 38 F.3d at 783.

3.    *Defendants Registered The Infringing Domain Names With The Bad Faith Intent To Profit From Them.*

Defendants intentionally chose to use the Infringing Domain Names to profit from the distinctive and famous GAYDAR mark.  The ACPA provides nine non-exclusive factors to assist courts in determining when a person has acted with bad faith intent:

> (I)  the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services, (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI)  the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

*Shields*, 254 F.3d at 484-485 (citing 15 U.S.C. § 1125(d)(1)(B)(i)).  The first four factors are seen as reasons why a defendant might have, in good faith, registered a certain domain name incorporating another's mark, while the remaining five factors are indicia of bad faith.  *Coca-Cola*, 382 F.3d at 785 (citation omitted).  Eight of the nine statutory

factors weigh in favor of finding that Defendants acted with a bad faith intent to profit from the GAYDAR mark.

The first four statutory factors (factors I through IV, *supra*) all weigh in favor of finding that the Defendants had a bad faith intent. *First*, Defendants have no legal rights in any of the marks that the Infringing Domain Names incorporate. In fact, the only part of the Infringing Domain Names that could possibly be entitled to protection is GAYDAR, a mark that is already the intellectual property of QSoft. *Second*, Defendants are not known by any of the Infringing Domain Names - in other words, no variation of the name Teddy Tong is to be found in any of the Infringing Domain Names. *Third*, Defendants have not previously used any of the Infringing Domain Names in the offering of goods and services. In fact, a presumption of bad faith arises in situations where the senior user's trademark is famous in the marketplace and the junior user was aware of the trademark and its fame. *Victoria's Secret Stores v. Artco Equipment Co., Inc.*, 194 F. Supp. 2d 704, 722 (S.D. Ohio 2002). *Fourth*, Defendants do not use the Infringing Domain Names for a non-commercial or "fair use" purpose. In fact, the opposite is true. The Infringing Domain Names are used to promote online services that directly compete with QSoft.

With respect to the remaining five factors (factors V, VII through IX, *supra*), four of them weigh in favor of finding that Defendants acted with bad faith intent to profit from the GAYDAR mark. Using misleading contact information, the Defendants registered multiple domain names, knowing that the domain names were confusingly similar to QSoft's distinctive and famous GAYDAR mark. Defendants did so, not for any legitimate purpose, but to divert consumers from QSoft's GAYDAR websites to

websites accessible through the Infringing Domain Names in a manner that could harm the goodwill of QSoft's GAYDAR mark by creating confusion as to the source of the domain names. Indeed, consumers intending to view and/or access QSoft's GAYDAR websites could be, and in some instances were, diverted to Defendants' Infringing Domain Names and corresponding websites, which promote online gay and lesbian oriented services that compete directly with QSoft.

Although Defendants have yet to offer to sell or transfer the Infringing Domain Names to QSoft (factor VI, *supra*), the other eight factors all weigh in favor of finding that the Defendants acted with a bad faith intent to profit from QSoft's GAYDAR mark. *See Coca-Cola*, 382 F.3d at 786-787 (holding that plaintiffs would likely establish that defendant acted with bad faith intent to profit where eight of the nine statutory factors weigh in favor of such a finding).

As the foregoing analysis shows, the Defendants have unquestionably engaged in "cybersquatting" by registering multiple domain names that are confusingly similar to QSoft's GAYDAR mark with the bad faith intent to profit from the GAYDAR mark. QSoft, therefore, has demonstrated a strong probability of success on the merits of its ACPA claim.

### D.    QSoft Will Be Irreparably Harmed If Preliminary Injunctive Relief Is Not Granted

QSoft has been, and will continue to be, irreparably harmed by Defendants' spamming attacks and domain name infringement if immediate injunctive relief is not granted. Irreparable harm includes "loss of control of reputation, loss of trade and loss of goodwill." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998). Defendants' unsolicited spamming attacks have already degraded the user-

experience of each affected GAYDAR Member, clogged the <gaydar.co.uk> network, and used up bandwidth purchased and provided by <gaydar.co.uk>.  In addition, messages likely to lead Gaydar Members into believing that the Infringing Domain Names and competing services are affiliated with or endorsed by QSoft are particularly harmful because of "the loss of goodwill and reputation arising from customer confusion about the source of defendants' spam e-mails and/or plaintiff's affiliation or sponsorship of them.  This kind of harm is not easily quantified and not adequately compensated with money damages."  *Hotmail Corp. v. Van$ Money Pie Inc.*, 47 U.S.P.Q. 2d 1020, 1025-26 (N.D. Cal. 1998).  Additionally, Defendants Infringing Domain Names are confusingly similar to QSoft's GAYDAR mark and GAYDAR websites.  Such a showing supports a strong presumption of irreparable harm to QSoft.[8]  *See Coca-Cola*, 382 F.3d at 789 ("A showing that confusion is likely supports a strong presumption of irreparable harm."); *Shields*, 254 F.3d at 486 (irreparable injury can be based on a finding of likelihood of confusion).  QSoft has therefore already suffered, and, if Defendants are not enjoined, will continue to suffer, irreparable harm from the distribution, promotion, and use of Defendants' spam campaign and Infringing Domain Names.

    In addition, if the Court does not enjoin the Defendants' operation of the Infringing Domain Names and the corresponding websites, QSoft will continue to suffer

---

[8] Although there is no appellate authority regarding whether or not irreparable harm may be presumed in cybersquatting actions upon a showing of likelihood of success on the merits (as there is in trademark infringement actions), several district courts have addressed the issue.  For example, the court in *Freedom Calls Found. v. Bukstel*, No. 05-CV-5460, 2006 WL 2620648 (E.D.N.Y. Sept. 12, 2006), found "following other district courts of the Second Circuit, this Court also finds that irreparable harm may be presumed for the Lanham Act cyber-squatting claim because Plaintiff has shown a likelihood of success on the merits." Since Congress embedded the ACPA within the Lanham Act, it seems consistent that irreparable harm will be presumed in cybersquatting cases upon a showing of likelihood of success on the merits (at least in those circuits holding that the harm is presumed in infringement cases).  The Third Circuit is one of those circuits.  *See Kos*, 369 F.3d at 726 (holding that plaintiff is entitled to a presumption that it will suffer irreparable harm absent an injunction once it was able to show a likelihood of success on its trademark claim).

irreparable harm. Defendants' Infringing Domain Names are likely to confuse Gaydar Members as to the source and sponsorship of the corresponding websites and to divert Gaydar Members from their intended website destinations. *See Coca-Cola*, 382 F.3d at 789-790. In fact, Defendants' Infringing Domain Names direct customers to websites that are in direct competition with the services provided by QSoft. *See* **Exhibit 7**. Moreover, QSoft will suffer damage to its reputation and a loss of goodwill should Defendants be allowed to continue to operate their Infringing Domain Names and corresponding websites. *See Shields*, 254 F.3d at 486.

### E.    Granting Preliminary Relief Will Not Result In Harm To Defendants

Defendants will not suffer any greater harm should a preliminary injunction be issued. Courts will balance the harm that QSoft would suffer in the absence of an injunction with the harm that the Defendants will suffer if an injunction is issued. *Kos*, 369 F.3d 727, 728. As noted above, QSoft will suffer a loss of customers and goodwill should an injunction not be granted. Any economic harm to the Defendants from being ordered to discontinue sending spam messages and the loss of the Infringing Domain Names would be minimal, at best.

Moreover, any injury to Defendants is one that they brought upon themselves by knowingly registering Infringing Domain Names, breaching QSoft's MTC, and sending spam messages. Indeed, the Third Circuit has recognized that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). To hold otherwise "would allow 'a knowing infringer [that] construct[s] its business around its

infringement' to avoid an injunction by claiming it would have a 'devastating effect' on that business, 'a result we cannot condone.'"  *Kos*, 369 F.3d at 728-729 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)).  In addition, "where the plaintiff is more likely to win, the less heavily need the balance of harm weigh in his favor."  *Novartis*, 290 F.3d at 597.  Given QSoft's strong showing of its likelihood of success on its CAN-SPAM Act and ACPA claims, as well as the fact that Defendants accepted the risk of injury (if any exists) by knowingly continuing to send spam messages and registering, in bad faith, the Infringing Domain Names, the Court should find that the balance of harms weigh in QSoft's favor.

### F.    Preliminary Relief Enjoining And Preventing Spam Is In The Public Interest

A preliminary injunction against Defendants serves public interest.  In passing the CAN-SPAM Act, Congress found that electronic mail had "become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis."  15 U.S.C. § 7701(a)(1).  Congress also found that spam imposes significant monetary costs on the public and that the problems associated with the rapid growth and abuse of unsolicited commercial electronic mail must be regulated.  *See* 15 U.S.C. § 7701.  As one court has found, the public interest in deterring spam that forces recipients to incur the costs of needlessly expending energy and time evaluating and eventually discarding unsolicited messages is great.  *See FTC v. Phoenix Avatar, LLC*, No 04 C 2897, 2004 WL 1746698, *14 (N.D. Ill. July 30, 2004) (granting a preliminary injunction against defendants for spamming in violation of the CAN-SPAM Act).  Hence, an injunction enjoining Defendants from their spamming activities is in the public interest.

The public interest is equally served by enjoining the Defendants from the use of the Infringing Domain Names and the corresponding websites.  As the Third Circuit has held in trademark cases, the "public interest … is a synonym for the right of the public not to be deceived or confused."  *Opticians Ass'n v. Indep. Opticians*, 920 F.3d 187, 197 (3d Cir. 1990); *see also Estate of Presley v. Russen*, 513 F.Supp. 1339, 1382 (D.N.J. 1981) ("[T]he public is interested in fair competitive practices and clearly opposed to being deceived in the marketplace.").  As shown above, Defendants' use of the Infringing Domain Names is commercially misleading.  The Infringing Domain Names are likely to confuse and divert customers from their intended online destinations and to damage QSoft's goodwill.  Accordingly, the public interest is served by the granting of a preliminary injunction.

<u>**CONCLUSION**</u>

Defendants' harmful and illegal spamming attacks and cybersquatting must cease. Defendants are in violation of the CAN-SPAM Act through their transmissions of hundreds of spam messages to Gaydar Members.  While the spam messages themselves violate the CAN-SPAM Act, Defendants' continued transmission of these messages to Gaydar Members, after being directed by QSoft to cease and desist on two prior occasions, requires this Court's immediate intervention, as does Defendants' promotion of competing products and services through the continued use of the Infringing Domain Names and corresponding websites.  QSoft has been and continues to suffer irreparable harm due to Defendants' actions.  QSoft therefore respectfully requests that the Court grant QSoft the requested injunctive relief set out in the attached proposed Preliminary Relief Order.

Dated:  June 19, 2007

**GREENBERG TRAURIG, LLP**

Donald J. Detweiler (I.D. #3087)
Sandra G. M. Selzer (I.D. #4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
302-661-7000
*detweilerd@gtlaw.com*
*selzers@gtlaw.com*

-and-

Paul D. McGrady
Anthony L. Abboud
Paul A. Del Aguila
Jason B. Elster
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
312-456-8400

Attorneys for QSoft Consulting Limited

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QSOFT CONSULTING LIMITED,      )
                               )
            Plaintiff,         )
                               )
      v.                       )  C.A. No. _____(    )
                               )
TEDDY TONG and TDTONG LTD.,    )
                               )
            Defendants.        )

# FILED UNDER SEAL:

## EXHIBITS 1, 7 AND 8 TO MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# SEALED

# DOCUMENT

# EXHIBIT 2



# Membership Terms and Conditions

These Membership Terms and Conditions apply where You choose to register as a Member of this website (the "**Site**"). This Site and the related gaydar, rainbownetwork, gaydargirls, gaydarradio and mygaydar sites are offered to you ("**Your**"/"**You**") by QSoft Consulting Limited (P.O. Box 113, Twickenham TW1 4WY) and its subsidiary companies. Registered in England and Wales. Registration Number: 3472519. Registered Office: 1 The Green, Richmond, Surrey, TW9 1PL, United Kingdom

**Please read these Membership Terms and Conditions carefully before registering on the Site as a Member. If You do not agree to these Membership Terms and Conditions, then You SHOULD NOT register as a Member.**

### 1. Acceptance of Membership Terms and Conditions
1.1 By clicking "Accept" to register You will be deemed to have consented to these Membership Terms and Conditions.
1.2 We reserve the right to change or update these Membership Terms and Conditions from time to time (subject to Your termination right pursuant to paragraph 8). Any revisions to these Membership Terms and Conditions will be notified to You the next time that You log on to the Site as a Member.

### 2. Description of Membership and Subscription
2.1 As a Member, You can take advantage of many services on the Site for free. However other areas of the site require payment of a Member subscription. For a full description of the services offered on this Site and the subscription options for Members, please follow and consult the **Benefits of Membership** page.
2.2 Member subscription payments can be made in UK Sterling, Euros or Dollars.
2.3 Please note that any Member subscription paid by You is subject to a minimum contractual period of one month.
2.4 Our VAT number is 809769283.

### 3. Age of Consent
3.1 You must be **18 years or over** to register as a Member. If We discover or have any reason to suspect that You are not over 18 years of age, then We reserve Our right to suspend or terminate Your Membership to this Site immediately and without notice.

### 4. Password Member Name and Security
4.1 Upon registration as a Member, You will select a Password and Member Name that You can use to access Your Member Account and Profile and to log on to the Members' area of the Site.
4.2 You are responsible for maintaining the confidentiality of Your Password and Member Name and are responsible for all activities that occur under them. We do not have the means to check the identity of people using the Members' area of the Site and will not be liable where Your Password or Member Name are used by someone else.
4.3 You agree to notify Us immediately of any unauthorised use of Your Password or Member Name or any other breach of security of which You become aware.

### 5. Your warranties
5.1 You warrant that:
5.1.1 You are over 18 years of age;
5.1.2 all information and details provided by You to Us (including on registration as a Member) are true, accurate and up to date in all respects and at all times (see Our **Privacy Policy** for details on how to update Your personal data); and
5.1.3 You will comply with these Membership Terms and Conditions including, without limitation, the restrictions relating to acceptable use set out at section 6 below.
5.2 You agree to indemnify and hold Us harmless from any claim or damages (including any legal fees in relation to same) made by a third party in respect of any matter in relation to or arising from Your use and Membership arising from any breach or suspected breach of these Membership Terms and Conditions by You or Your violation of any law or the rights of any third party.

### 6. Acceptable Use
**6.1 We support the free flow of information and ideas over the Internet and do not actively monitor use of the Site, including the Members' area under normal circumstances. We seek to balance this aim with Our obligations to other Members and at law however. We do therefore review all profiles entered onto the Site by Members, check instant messages where certain keywords are triggered and log chatroom exchanges in order to ensure compliance with these terms, and to comply with or investigate any enforcement agency or**

**police request or complaints. We also therefore require that You do not:**

6.1.1 say or do anything that would cause annoyance, inconvenience, harassment or needless anxiety to others;

6.1.2 advertise or promote third party or Your own products or services including by way of the distribution of 'spam' mail;

6.1.3 use foul, threatening or offensive language including, without limitation, racist, sexist, ageist, homophobic or sexually explicit language where inappropriate;

6.1.4 make insulting remarks to or about other Members ("flaming");

6.1.5 jump in and out of Site forum rooms ("frogging");

6.1.6 distribute illegal, copyright infringing, indecent or offensive material or any messages or content that may incite disorder or encourage illegal activities or that causes or may cause harm to minors;

6.1.7 impersonate another person or Member;

6.1.8 transfer files that contain viruses, trojans or other harmful programs;

6.1.9 use the Site to conduct any fraudulent activity including any "pyramid scheme"; "ponzi scheme" or "chain letter";

6.1.10 access or attempt to access the accounts of other Members or to penetrate or attempt to penetrate the Site security measures;

6.1.11 have more than one Member Account at any time.

6.2 We may take any or all of the following action at Our discretion:

6.2.1 remove any Member profile (including photographs) or other material that, in Our sole discretion may be inappropriate or We suspect to be illegal, subject Us to liability or which may violate these Membership Terms and Conditions or where required to do so by law;

6.2.2 issue Members with verbal or written warnings and may take such further action as We deem appropriate under this paragraph 6.2 if such warnings are not heeded;

6.2.3 suspend or terminate a Member's access to the Members' area of the Site or a Member's Account without notice at any time;

6.2.4 inform the appropriate authorities and provide them with information regarding any suspected illegal activity; or

6.2.5 bring legal action against a Member or other user of the Site in relation to any breach of these Membership Terms and Conditions or any illegal or suspected illegal activity.

**We will determine what action is appropriate to be taken against a Member on a case by case basis.**

6.3 You acknowledge that We may be required by law or regulation to access, monitor, store or copy material sent by or to Members without further notice to You.

## 7. Cancellation

7.1 Your Membership services commence immediately when You submit Your registration, or subscription. This means that, subject always to Your right to terminate as set out below, You will not be able to cancel the services after this point.

## 8.Termination of Membership

8.1 Subject to paragraph 8.2 below, You can terminate Your Membership at any time by notifying Us at **support@gaydar.co.uk**

8.2 Please note that any Member subscription paid by You is subject to the minimum contractual period of one month. This means that, where You choose to terminate Your Member subscription before the expiry of this period, You will not receive any refund in respect of this minimum contractual period.

8.3 No refunds will be paid by Us where Your Membership is terminated by Us as a consequence of Your breach of these Membership Terms and Conditions.

## 9. Copyright and Other Intellectual Property Rights

9.1 Your use of the Site grants no rights to You in relation to copyright, trade marks or other of Our intellectual property rights or the intellectual property rights of third parties.

9.2 You may not, without limitation, copy, reproduce, republish, download, post, broadcast, record, transmit, commercially exploit, communicate to the public, or otherwise use the content included in or provided via the Site except for Your own personal, non-commercial use. Subject to the above, You may download insubstantial excerpts of this content to Your hard disk for the purpose of viewing it provided that no more than one copy of any information is made.

## 10. Limitation of Liability

10.1 Whilst We will use all reasonable endeavours to correct any errors or omissions as soon as practicable once they have been brought to Our attention, We do not warrant that the Site will be available uninterrupted and in a fully operating condition nor that the information on and provided via the Site will be free from errors or omissions.

10.2 Access to this Site and its contents may be suspended temporarily and without notice in the case of system failure, necessary maintenance or repair or for reasons beyond Our control.

10.3 Save that nothing in this paragraph 10 shall restrict Your statutory rights (including Your right to receive a reasonable standard of service), all content and services on this Site are provided on an 'as is' and 'as available' basis. We do not make any representation or give any warranty in respect of the Site or its content, including, without limitation information provided by or regarding other Members. We can not vet all Member profiles and entries to ensure that they

are appropriate or correct. **Any decision made or action taken by You on the basis of information provided on or via the Site is at Your sole discretion and risk.**

10.4 Due to the fact that many technical aspects of the Site and the content provided herein is supplied by or otherwise dependent on third parties, We do not give any warranty as to the accuracy, suitability, reliability, completeness, performance, satisfactory quality, fitness for a particular purpose, or freedom from viruses, or other harmful programs of the content contained in or accessed through this Site.

10.5 We will not be liable for any damages, including indirect or consequential losses and whether in contract, tort (including negligence) or otherwise, arising in connection with any use by You or other Members of the Site that is in contravention of these Membership Terms and Conditions or is not directly attributable to Our negligence. Where We are liable for direct loss this will be limited to a maximum of the total price of the Member Subscription paid to Us by You in the 6 months prior to the claim.

10.6 Nothing in these Terms and Conditions shall exclude or limit Our liability for death or personal injury caused by Our negligence.

## 11. Security and Privacy

11.1 Your security and those of all Our Members is very important to Us. Please read Our **Privacy Policy** for important information regarding the use of Your personal data and Your rights in relation to this.

## 12. General

12.1 We shall not be liable for any failure for any suspension, or termination of access to the Site or any content arising out of a force majeure event. A force majeure event shall include, without limitation, failure of infrastructure, government intervention, wars, civil commotion, hijacking, fire, flood, accident, storm, strikes, lockouts, terrorist attacks, or industrial action affecting Us or Our suppliers.

12.2 If any of these Membership Terms and Conditions are determined to be illegal, invalid or otherwise unenforceable by reason of law then to the extent and within the jurisdiction in which that term is illegal, invalid or unenforceable, it shall be severed and deleted from these terms and the remaining terms shall survive, remain in full force and effect and continue to be binding and enforceable.

12.3 These Membership Terms and Conditions shall be governed by and interpreted in accordance with the laws of England. Disputes arising in connection with these terms shall be subject to the exclusive jurisdiction of the courts of England and Wales.

## 13. Complaints and Feedback

13.1 If You have any complaints about another Member or any aspect of the Site or if You have any questions or would otherwise like to provide any other feedback, then You can contact Us by emailing: **support@gaydar.co.uk** or writing to us at the address set out at the top of these terms.

Commercial Membership Terms and Conditions

Designed by QSoft Consulting Ltd. © 1999-2006 QSoft Consulting Ltd. All rights reserved.

# EXHIBIT 3



# EXHIBIT 4



Geektels | RFCs | Hotspots | Tools | Traceroute | Whois

**IP Route Analytics**
Free white paper on monitoring OSPF EIGRP,
BGP, IS-IS, and MPLS VPNs

**WHOIS**
Beginner's Guide to WHOIS.
www.beginnersguide.biz

Ads by Google



Whois: `gaydarboys.net`    Whois >>

Checking server [whois.crsnic.net]

Checking server [whois.estdomains.com]
Results:
Registration Service Provided By: ESTDOMAINS INC
Contact: +1.3027224217
Website: http://www.estdomains.com

Domain Name: GAYDARBOYS.NET

Registrant:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Creation Date: 21-Nov-2006
Expiration Date: 21-Nov-2007

Domain servers in listed order:
park21.secureserver.net
park22.secureserver.net

Administrative Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Technical Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Billing Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Status:ACTIVE

The data in this whois database is provided to you for informationpurposes only, that is,
to assist you in obtaining information about or related to a domain name registration
record. We make this informationavailable "as is", and do not guarantee its accuracy.
By submitting awhois query, you agree that you will use this data only for
lawfulpurposes and that, under no circumstances will you use this data to:(1) enable
high volume, automated, electronic processes that stress orload this whois database
system providing you this information; or(2) allow, enable, or otherwise support the
transmission of massunsolicited, commercial advertising or solicitations via
fascimile,electronic mail, or by telephone. The compilation, repackaging,dissemination
or other use of this data is expressly prohibited withoutprior written consent from us.
The registrar of record is Critical Internet, Inc.. We reserve the right to modifythese
terms at any time. By submitting this query, you agree to abideby these terms.

---

Results brought to you by the GeekTools Whois Proxy
Server results may be copyrighted and are used with permission.
Proxy © 1999-2005 CenterGate Research Group LLC
Your host (66.151.14.170) has visited 4 times today.

**Dedicated Servers $59/mo** - 40GB storage, 1200GB transfer
Linux OS, Plesk, cPanel, and more! www.nexpoint.net

Ads by Google                                                    Advertise

Copyright Centergate® Research Group, LLC 1998 - 2007

 

Geektels | RFCs | Hotspots | Tools | Traceroute | Whois

**IP Route Analytics**
Free white paper on monitoring OSPF EIGRP,
BGP, IS-IS, and MPLS VPNs

**WHOIS**
Beginner's Guide to WHOIS.
www.beginnersguide.biz

Ads by Google



Whois: gaydarcams.net    Whois >>

Checking server [whois.crsnic.net]

Checking server [whois.estdomains.com]
Results:
Registration Service Provided By: ESTDOMAINS INC
Contact: +1.3027224217
Website: http://www.estdomains.com

Domain Name: GAYDARCAMS.NET

Registrant:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Creation Date: 15-Nov-2006
Expiration Date: 15-Nov-2007

Domain servers in listed order:
park21.secureserver.net
park22.secureserver.net

Administrative Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Technical Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Billing Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Status:ACTIVE

The data in this whois database is provided to you for informationpurposes only, that is, to assist you in obtaining information about or related to a domain name registration record. We make this informationavailable "as is", and do not guarantee its accuracy. By submitting awhois query, you agree that you will use this data only for lawfulpurposes and that, under no circumstances will you use this data to:(1) enable high volume, automated, electronic processes that stress orload this whois database system providing you this information; or(2) allow, enable, or otherwise support the transmission of massunsolicited, commercial advertising or solicitations via fascimile,electronic mail, or by telephone. The compilation, repackaging,dissemination or other use of this data is expressly prohibited withoutprior written consent from us. The registrar of record is Critical Internet, Inc.. We reserve the right to modifythese terms at any time. By submitting this query, you agree to abideby these terms.

---

Results brought to you by the GeekTools Whois Proxy
Server results may be copyrighted and are used with permission.
Proxy © 1999-2005 CenterGate Research Group LLC
Your host (66.151.14.170) has visited 5 times today.

# Dedicated Servers $59/mo

40GB storage, 1200GB transfer Linux OS, Plesk, cPanel, and more! www.nexpoint.net

Ads by Google

Advertise

*Copyright Centergate® Research Group, LLC 1998 - 2007*



Geektels | RFCs | Hotspots | Tools | Traceroute | Whois

**IP Route Analytics**
Free white paper on monitoring OSPF EIGRP, BGP, IS-IS, and MPLS VPNs

**WHOIS**
Beginner's Guide to WHOIS.
www.beginnersguide.biz

 Ads by Google



**Whois:** gaydarguyz.com          Whois >>

Checking server [whois.crsnic.net]

Checking server [whois.estdomains.com]
Results:
Registration Service Provided By: ESTDOMAINS INC
Contact: +1.3027224217
Website: http://www.estdomains.com

Domain Name: GAYDARGUYZ.COM

Registrant:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Creation Date: 23-Nov-2006
Expiration Date: 23-Nov-2007

Domain servers in listed order:
park21.secureserver.net
park22.secureserver.net

Administrative Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Technical Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Billing Contact:
tdtong ltd.
Teddy Tong (wrotepiqueweight@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Status:ACTIVE

The data in this whois database is provided to you for informationpurposes only, that is,
to assist you in obtaining information about or related to a domain name registration
record. We make this informationavailable "as is", and do not guarantee its accuracy.
By submitting awhois query, you agree that you will use this data only for
lawfulpurposes and that, under no circumstances will you use this data to:(1) enable
high volume, automated, electronic processes that stress orload this whois database
system providing you this information; or(2) allow, enable, or otherwise support the
transmission of massunsolicited, commercial advertising or solicitations via
fascimile,electronic mail, or by telephone. The compilation, repackaging,dissemination
or other use of this data is expressly prohibited withoutprior written consent from us.
The registrar of record is Critical Internet, Inc.. We reserve the right to modifythese
terms at any time. By submitting this query, you agree to abideby these terms.

Results brought to you by the GeekTools Whois Proxy
Server results may be copyrighted and are used with permission.
Proxy © 1999-2005 CenterGate Research Group LLC
Your host (66.151.14.170) has visited 6 times today.

**Looking for TCP/IP info?**
Get the latest news, tutorials, white papers, and much more.
Networking.ITtoolbox.com

**IP Address Management**
Proteus Enterprise IPAM Appliance Try a live demo now.

Ads t

*Copyright Centergate® Research Group, LLC 1998 - 2007*



Geektels | RFCs | Hotspots | Tools | Traceroute | Whois

**IP Route Analytics**
Free white paper on monitoring OSPF EIGRP,
BGP, IS-IS, and MPLS VPNs

**Looking for TCP/IP info?**
Get the latest news, tutorials, white papers,
and much more.





**Whois:** myqaydar.com          Whois >>

Checking server [whois.crsnic.net]

Checking server [whois.estdomains.com]
Results:
Registration Service Provided By: ESTDOMAINS INC
Contact: +1.3027224217
Website: http://www.estdomains.com

Domain Name: MYQAYDAR.COM

Registrant:
n/a
Teddy Tong (avraam02@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Creation Date: 23-Nov-2006
Expiration Date: 23-Nov-2007

Domain servers in listed order:
park21.secureserver.net
park22.secureserver.net

Administrative Contact:
n/a
Teddy Tong (avraam02@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Technical Contact:
n/a
Teddy Tong (avraam02@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Billing Contact:
n/a
Teddy Tong (avraam02@yahoo.com)
45 10-th ave #19
Princeton
New Jersey,08540
US
Tel. +001.6099872348

Status:ACTIVE

The data in this whois database is provided to you for informationpurposes only, that is,
to assist you in obtaining information about or related to a domain name registration
record. We make this informationavailable "as is", and do not guarantee its accuracy.
By submitting awhois query, you agree that you will use this data only for
lawfulpurposes and that, under no circumstances will you use this data to:(1) enable
high volume, automated, electronic processes that stress orload this whois database
system providing you this information; or(2) allow, enable, or otherwise support the
transmission of massunsolicited, commercial advertising or solicitations via
fascimile,electronic mail, or by telephone. The compilation, repackaging,dissemination
or other use of this data is expressly prohibited withoutprior written consent from us.
The registrar of record is Critical Internet, Inc.. We reserve the right to modifythese
terms at any time. By submitting this query, you agree to abideby these terms.

Results brought to you by the GeekTools Whois Proxy
Server results may be copyrighted and are used with permission.
Proxy © 1999-2005 CenterGate Research Group LLC
Your host (66.151.14.170) has visited 7 times today.

http://www.geektools.com/whois.php

**Dedicated Servers $59/mo** - 40GB storage, 1200GB transfer
Linux OS, Plesk, cPanel, and more! www.nexpoint.net

Ads by Google

Advertise

Copyright Centergate® Research Group, LLC 1998 - 2007



Geektels | RFCs | Hotspots | Tools | Traceroute | Whois

**IP Route Analytics**
Free white paper on monitoring OSPF EIGRP, BGP, IS-IS, and MPLS VPNs

**Looking for TCP/IP info?**
Get the latest news, tutorials, white papers, and much more.

Ads by Google



**Whois:** myrealjocks.com    Whois >>

Checking server [whois.crsnic.net]

Checking server [whois.godaddy.com]
Results:
The data contained in GoDaddy.com, Inc.'s WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, Inc. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" field. In most cases, GoDaddy.com, Inc.
is not the registrant of domain names listed in this database.

Registrant:

Teddy Tong
Lengting ave 14-51
San Francisco, California 94104
United States

Registered through: GoDaddy.com, Inc. (http://www.godaddy.com)
Domain Name: MYREALJOCKS.COM
Created on: 27-Feb-07
Expires on: 27-Feb-08
Last Updated on:

Administrative Contact:
Tong, Teddy undoblewsolebeside@yahoo.com
Lengting ave 14-51
San Francisco, California 94104
United States
14158342352

Technical Contact:
Tong, Teddy undoblewsolebeside@yahoo.com
Lengting ave 14-51
San Francisco, California 94104
United States
14158342352

Domain servers in listed order:
NS1.AWMTHOST.COM
NS2.AWMTHOST.COM

Results brought to you by the GeekTools Whois Proxy
Server results may be copyrighted and are used with permission.
Proxy © 1999-2005 CenterGate Research Group LLC
Your host (66.151.14.170) has visited 8 times today.

**Dedicated Servers $59/mo** - 40GB storage, 1200GB transfer
Linux OS, Plesk, cPanel, and more! www.nexpoint.net

Ads by Google

Advertise

Copyright Centergate® Research Group, LLC 1998 - 2007

# EXHIBIT 5

**OLSWANG**

Teddy Tong
45 10-th Ave #19
Princeton
New Jersey,08540
United States

27 November 2006

**Pages**     1 of 4

**Our Ref.**     JAB\CPB\AYW\11569\34
**Your Ref.**

**By Post, and Email**
**Email: avraam02@yahoo.com**

Dear Sirs,

**SPAM and Domain names – www.gaydarboys.net ; www.gaydarcams.net ; www.mygaydar.com**

We act for QSoft Consulting Limited, the operators of the Gaydar.co.uk website. QSoft Consulting Limited are the proprietors of a number of UK and Community Trade Mark Registrations including the word GAYDAR under CTM Nos. 3804168, 2127264 and 3886256 and (inter alia) the domain name www.gaydar.co.uk and related URLs. Copies of the details of these registrations are attached at **Annex 1**. Our client is determined to tackle the sending of unsolicited messages to Gaydar users including bringing legal proceedings against those responsible where necessary. In addition, our client is not prepared to tolerate infringement of its trade mark.

**Spam**

Our client understands that you, or someone on your behalf have registered multiple accounts on gaydar.co.uk and that you have used these accounts to send a large number of messages to Gaydar users via private chat rooms (the "Spam"). The Spam advertise and link Gaydar users to the websites www.gaydarboys.net and www.gaydarcams.net and www.mygaydar.com ("the Websites"). Our client's investigations suggest that the Spam purportedly originated from you or your Website. Your details are registered as the registrant of the Websites on the WHOIS domain registration search. The Websites provide a number of contact details all of which have been directly written to and/or cc'ed to this letter.

The user names registered which are involved in sending the Spam include speciallyexult and bargeincidence.

Our client is now carrying out further investigations. The Spam was unsolicited and our client's investigations suggest that you were responsible for sending them or instigated them being sent or are acting in common design with a third party sending or instigating them being sent. If the

90 High Holborn
London WC1V 6XX
www.olswang.com

T +44 (0) 20 7067 3000
F +44 (0) 20 7067 3999
DX 37972 Kingsway

Regulated by the Law Society

Spam are proven to be unsolicited, you will have conducted a number of unlawful activities, for which our client is entitled to bring legal proceedings against you.

**Breach of Contract – terms and conditions of website**

In order to use any Gaydar services, including the Gaydar chat room and private chat service, registrants must agree and comply with the Gaydar Website Terms of Use. A copy of the Gaydar Website Terms of Use is attached at **Annex 2**.

The Gaydar Website Terms of Use include the following provisions:

> **6.1 We also therefore require that You do not:**
> 6.1.1 say or do anything that would cause annoyance, inconvenience, harassment or needless anxiety to others;
> 6.1.2 advertise or promote third party or Your own products or services including by way of the distribution of 'spam' mail;
> 6.1.5 jump in and out of Site forum rooms ("frogging");
> 6.1.11 have more than one Member Account at any time.

Registrants of a Gaydar account are bound by the above obligations.

By signing up or procuring people to sign up you are bound by the terms. Your activities constitute a breach of the Gaydar Website Terms of Use including those identified above, entitling our client to claim against you for breach of contract.

Our client reserves all its rights including bringing proceedings for the breach of contract and including all its rights in relation to:

- Breach Of Privacy And Electronic Communications (EC Directive) Regulations 2003 (The *Regulations*)

- Breach Of Computer Misuse Act 1990

- Trespass To Goods

- Unlawful Interference

In particular, our client reserves its right to seek an interlocutory injunction.

**Commencement of proceedings**

Our client has taken steps under clause 6.2 of the Conditions to terminate your access to its site and will remove any further profiles created by your or on your behalf.  Our client wishes to inform you that no one connected to the Websites will be welcome on our client's site, our client will not refund any subscriptions and will take further action to enforce its position if necessary.

**Trade mark infringement**

As you will no doubt be aware, since 1999 our client has been involved in the supply of dating services under the brand name GAYDAR. GAYDAR is a global brand and gaydar.co.uk has

over 3 million members. According to Hitwise, the leading online competitive intelligence service, gaydar.co.uk is the UK's largest gay and lesbian dating website by share of visits (October 2005). In that month, gaydar.co.uk received 13.95% of all visits made to dating websites. October 2006 figures from Hitwise show that gaydar.co.uk continues to be the UK's largest gay and lesbian dating website with 43.94% of the market.

Our client's brand is therefore extremely well known throughout the supply of dating services industry. Accordingly, our client has a protectable goodwill in the trade mark GAYDAR. It is inevitable that any use of this trade mark will cause confusion in the minds of the public, leading them to mistakenly believe that a business using this mark is somehow associated or connected with our client's business.

Our client became aware on 22 November 2006 that you sent a number of chat room messages including those attached between 21 November and 24 November 2006 advertising services on the sites gaydarboys.net, gaydarcams.net and myqaydar.com (the "Websites"). Anyone seeing these advertisements will associate your dating service with that of our client. Accordingly, your company's use of our client's trade mark GAYDAR constitutes passing off. Further, your use of the mark in relation to Dating Services is an infringement of our client's trade mark. Your continued use of GAYDAR will cause substantial damage to our client's goodwill and reputation.

Further, your use of the mark in relation to the supply of Dating Services is an infringement of our client's Trade Marks because it is the use of an identical mark in relation to identical or similar services in circumstances where there is a likelihood of confusion.

**Domain Name**

You have also registered the domain names gaydarboys.net, gaydarcams.net and myqaydar.com (the "Websites"). It is inevitable that any use of these domain names will cause confusion in the minds of the public given the use of the GAYDAR mark in the URL, leading them to mistakenly believe that your business is somehow associated or connected with our client's business.

The domain names do not appear to be running at the current time, but seem to have been set up to directly compete with our client's goods and services. Given the use of the GAYDAR mark in the URL of the Domain Names and the GAYDAR mark at the top of a number of the domain names' homepages, internet users will assume that the Domain Names are associated with our client when that is not the case.

Your registration of the Domain Names amounts to an "abusive registration" under the Nominet Dispute Resolution Service ("DRS") Policy and WIPO. We consider that you have registered the Domain Names primarily *"for the purpose of unfairly disrupting our business"*. We also consider that you are *"using the Domain Names in a way which has confused people or*

*businesses into believing that the Domain Names are registered to, operated or authorised by, or otherwise connected with"* our client.

**Action required**

Our client is not prepared to tolerate this infringement of its rights, or allow these unlawful activities to continue. Accordingly, we require you to transfer ownership of the Domain Names to our client and to take the necessary steps to complete the transfer. To avoid infringing our client's rights, kindly provide an undertaking that you will cease to use the domain names listed above and agree to assign this domain name to our client. We require you to agree to cease your unlawful conduct in connection with these domain names, and any others and to undertake not to repeat the offence. We attach undertakings for you to sign and return to us.

As such, our client requires your written response and the signed undertaking no later than **12pm** on **Friday 1 December 2006**.

Our client also requires your proposals for financial compensation.  Such proposals should include a reasonable payment towards damages suffered by our client.  In the meantime, our client reserves all its rights generally.

Should you fail to provide an acceptable response within the above deadline, we will assume that you are involved in the unlawful activities described above and our client will not hesitate to commence legal proceedings against you in respect of each of the causes of action set out in this letter seeking the following remedies:

- an injunction to prevent you from sending spam to Gaydar users;

- an injunction to prevent you abusing the Gaydar Trade Mark;

- damages and/or an account of profits;

- delivery–up of all your records of Gaydar users to whom spam has been sent; and

- recovery of its legal costs.

Our client is in the process of obtaining US legal advice regarding the enforcement of claims against you.

**We recommend that you seek independent legal advice on this matter as soon as possible**.

Yours faithfully

*Olswang*

**OLSWANG**

Encs. Undertakings

**ANNEX 1**



## CTM-ONLINE - Detailed trade mark information



| | |
|---|---|
| **Trade mark name :** | GAYDAR |
| **Trade mark No :** | 003804168 |
| **Trade mark basis:** | CTM |
| **Number of results:** | 1 of 1 |

### Trade mark

| | |
|---|---|
| **Filing date:** | 29/04/2004 |
| **Date of registration:** | 15/11/2005 |
| **Expiry Date:** | 29/04/2014 |
| **Nice Classification:** | 38, 41 ( ➡ Nice classification) |
| **Trade mark:** | Individual |
| **Type of mark:** | Word |
| **Acquired distinctiveness:** | No |
| **Your reference:** | EU9233/MAR |
| **Status of trade mark:** | Registration published ( ➡ Glossary) |
| | ( ➡ History of statuses) |
| **Filing language:** | English |
| **Second language:** | Italian |

### Graphic representation

No entry for application number: 003804168.

### ⊞ List of goods and services

| | |
|---|---|
| **Nice Classification:** | 38 |
| **List of goods and services** | Operation of chat rooms. |
| | |
| **Nice Classification:** | 41 |
| **List of goods and services** | Entertainment; publishing services; electronic publishing services; publication of texts; production, presentation, distribution, syndication, networking and rental of TV and radio programmes, interactive entertainment, films and sound and video recordings, interactive compact discs and CD-ROMs; production and rental of educational and instructional materials; exhibition services; organisation, production and presentation of shows, competitions, contests, games, concerts and events; club services (entertainment); educational examinations; language teaching; provision of language schools and language courses; rental of radio and TV broadcasting facilities; provision of entertainment and education for accessing via communication and computer networks; provision of information relating to radio and TV programmes for accessing via communication and computer networks; provision of information for or relating to education, entertainment, cultural or recreational purposes; provision of information and advisory services relating to entertainment, education, culture or to any of the aforesaid services. |

### Description

**Description of the mark:**    No Description

## Owner

| | |
|---|---|
| Name: | QSoft Consulting Limited |
| ID No: | 218002 |
| Natural or legal person: | Legal entity |
| Address: | 6th Floor, Queens House 2 Holly Road |
| Post code: | TW1 4EG |
| Town: | Twickenham, |
| Country: | UNITED KINGDOM |
| County: | Middlesex |
| Correspondence address: | QSoft Consulting Limited 6th Floor, Queens House 2 Holly Road Twickenham, Middlesex TW1 4EG REINO UNIDO |

## Representative

| | |
|---|---|
| Name: | ALEXANDER RAMAGE ASSOCIATES |
| ID No: | 10679 |
| Address: | 20 High Street |
| Post code: | GU21 6BW |
| Town: | Woking |
| Country: | UNITED KINGDOM |
| Correspondence address: | ALEXANDER RAMAGE ASSOCIATES 20 High Street Woking GU21 6BW REINO UNIDO |
| Telephone: | 00 44-1483750701 |
| Fax: | 00 44-1483740560 |
| E-mail: | ⊞ ara@ramage.co.uk |

## Seniority

No entry for application number: 003804168.

## Exhibition priority

No entry for application number: 003804168

## Priority

No entry for application number: 003804168.

## Publication

| | |
|---|---|
| Bulletin no.: | ⊞ **2005/015** |
| Date of publication: | 11/04/2005 |
| Part: | A.1 |
| | |
| Bulletin no.: | ⊞ **2006/004** |
| Date of publication: | 23/01/2006 |
| Part: | B.2 |

## Opposition

No entry for application number: 003804168.

## Cancellation

No entry for application number: 003804168.

## Appeals

No entry for application number: 003804168.

Case 1:07-cv-00391-UE - Document 4-6 - Filed 06/19/2007 - Page 9 of 26

### Recordals

No entry for application number: 003804168

### Renewals

No entry for application number: 003804168.

Disclaimer and Copyright I



OAMI-ONLINE - CTM-ONLINE - Detailed trade mark information

ES | DE | EN

Contact | Site Map | Search

## CTM-ONLINE - Detailed trade mark information



| | |
|---|---|
| **Trade mark name :** | GAYDAR |
| **Trade mark No :** | 002127264 |
| **Trade mark basis:** | CTM |
| **Number of results:** | 1 of 1 |

### Trade mark

| | |
|---|---|
| **Filing date:** | 13/03/2001 |
| **Date of registration:** | 09/01/2003 |
| **Expiry Date:** | 13/03/2011 |
| **Nice Classification:** | 35, 38, 42 ( ➡ Nice classification) |
| **Trade mark:** | Individual |
| **Type of mark:** | Word |
| **Acquired distinctiveness:** | No |
| **Status of trade mark:** | Registration published ( ➡ Glossary) |
| | ( ➡ History of statuses) |
| **Filing language:** | English |
| **Second language:** | Spanish |

### Graphic representation

No entry for application number: 002127264.

### ⊞ List of goods and services

| | |
|---|---|
| **Nice Classification:** | 35 |
| **List of goods and services** | Advertising and sales promotional services provided by means of the Internet. |
| **Nice Classification:** | 38 |
| **List of goods and services** | Communication services provided by means of an interactive website. |
| **Nice Classification:** | 42 |
| **List of goods and services** | Dating agency services provided via the Internet; website design services; website consultancy services. |

### Description

| | |
|---|---|
| **Description of the mark:** | No Description |

### Owner

| | |
|---|---|
| **Name:** | QSoft Consulting Limited |
| **ID No:** | 218002 |
| **Natural or legal person:** | Legal entity |
| **Address:** | 6th Floor, Queens House 2 Holly Road |
| **Post code:** | TW1 4EG |
| **Town:** | Twickenham, |
| **Country:** | UNITED KINGDOM |
| **County:** | Middlesex |
| **Correspondence address:** | QSoft Consulting Limited 6th Floor, Queens House 2 |

Holly Road Twickenham, Middlesex TW1 4EG REINO UNIDO

## Representative

| | |
|---|---|
| **Name:** | ALEXANDER RAMAGE ASSOCIATES |
| **ID No:** | 10679 |
| **Address:** | 20 High Street |
| **Post code:** | GU21 6BW |
| **Town:** | Woking |
| **Country:** | UNITED KINGDOM |
| **Correspondence address:** | ALEXANDER RAMAGE ASSOCIATES 20 High Street Woking GU21 6BW REINO UNIDO |
| **Telephone:** | 00 44-1483750701 |
| **Fax:** | 00 44-1483740560 |
| **E-mail:** | ⊞ ara@ramage.co.uk |

## Seniority

No entry for application number: 002127264.

## Exhibition priority

No entry for application number: 002127264

## Priority

No entry for application number: 002127264.

## Publication

| | |
|---|---|
| **Bulletin no.:** | 2002/059 |
| **Date of publication:** | 29/07/2002 |
| **Part:** | A.1 |
| | |
| **Bulletin no.:** | 2003/017 |
| **Date of publication:** | 24/02/2003 |
| **Part:** | B.1 |

## Opposition

No entry for application number: 002127264.

## Cancellation

No entry for application number: 002127264

## Appeals

No entry for application number: 002127264.

## Recordals

No entry for application number: 002127264

## Renewals

No entry for application number: 002127264.

Disclaimer and Copyright I

OAMI-ONLINE - CTM-ONLINE - Detailed trade mark information



## CTM-ONLINE - Detailed trade mark information

 

| | |
|---|---|
| **Trade mark name :** | gaydar |
| **Trade mark No :** | 003886256 |
| **Trade mark basis:** | CTM |
| **Number of results:** | 2 of 5 |

### Trade mark

| | |
|---|---|
| **Filing date:** | 21/06/2004 |
| **Date of registration:** | 11/10/2005 |
| **Expiry Date:** | 21/06/2014 |
| **Nice Classification:** | 35, 38, 41, 45 ( ➡ Nice classification) |
| **Trade mark:** | Individual |
| **Type of mark:** | Figurative |
| **Vienna Classification:** | 1.1.2, 1.1.99, 26.15.98 ( ➡ Vienna Classification) |
| **Acquired distinctiveness:** | No |
| **Your reference:** | EU9341/MAR |
| **Status of trade mark:** | Registration published ( ➡ Glossary) |
| | ( ➡ History of statuses) |
| **Filing language:** | English |
| **Second language:** | Italian |

### Graphic representation



### ⊞ List of goods and services

| **Nice Classification:** | 35 |
|---|---|
| **List of goods and services** | Advertising, marketing and promotional services; including such services provided by means of the |

Internet.

| | |
|---|---|
| **Nice Classification:** | 38 |
| **List of goods and services** | Communication services; including such services provided by means of an interactive website; operation of chat rooms. |

| | |
|---|---|
| **Nice Classification:** | 41 |
| **List of goods and services** | Entertainment; publishing services; electronic publishing services; publication of texts; production, presentation, distribution, syndication, networking and rental of TV and radio programmes, interactive entertainment, films and sound and video recordings, interactive compact discs and CD-ROMs; production and rental of educational and instructional materials; exhibition services; organisation, production and presentation of shows, competitions, contests, games, concerts and events; club services (entertainment); educational examinations; language teaching; provision of language schools and language courses; rental of radio and TV broadcasting facilities; provision of entertainment and education for accessing via communication and computer networks; provision of information relating to radio and TV programmes for accessing via communication and computer networks; provision of information for or relating to education, entertainment, cultural or recreational purposes; provision of information and advisory services relating to entertainment, education, culture or to any of the aforesaid services. |

| | |
|---|---|
| **Nice Classification:** | 45 |
| **List of goods and services** | Introduction agency services; including such services provided via the Internet. |

## Description

| | |
|---|---|
| **Description of the mark:** | No Description |

## Owner

| | |
|---|---|
| **Name:** | QSoft Consulting Limited |
| **ID No:** | 218002 |
| **Natural or legal person:** | Legal entity |
| **Address:** | 6th Floor, Queens House 2 Holly Road |
| **Post code:** | TW1 4EG |
| **Town:** | Twickenham, |
| **Country:** | UNITED KINGDOM |
| **County:** | Middlesex |
| **Correspondence address:** | QSoft Consulting Limited 6th Floor, Queens House 2 Holly Road Twickenham, Middlesex TW1 4EG REINO UNIDO |

## Representative

| | |
|---|---|
| **Name:** | ALEXANDER RAMAGE ASSOCIATES |
| **ID No:** | 10679 |
| **Address:** | 20 High Street |
| **Post code:** | GU21 6BW |
| **Town:** | Woking |
| **Country:** | UNITED KINGDOM |
| **Correspondence address:** | ALEXANDER RAMAGE ASSOCIATES 20 High Street Woking GU21 6BW REINO UNIDO |
| **Telephone:** | 00 44-1483750701 |
| **Fax:** | 00 44-1483740560 |
| **E-mail:** | ⊞ ara@ramage.co.uk |

## Seniority

No entry for application number: 003886256.

---

### Exhibition priority ◀

No entry for application number: 003886256

---

### Priority ◀

No entry for application number: 003886256.

---

### Publication ◀

| | |
|---|---|
| **Bulletin no.:** | ⊞ **2005/011** |
| **Date of publication:** | 14/03/2005 |
| **Part:** | A.1 |
| | |
| **Bulletin no.:** | ⊞ **2005/051** |
| **Date of publication:** | 19/12/2005 |
| **Part:** | B.2 |

---

### Opposition ◀

No entry for application number: 003886256.

---

### Cancellation ◀

No entry for application number: 003886256

---

### Appeals ◀

No entry for application number: 003886256.

---

### Recordals ◀

No entry for application number: 003886256

---

### Renewals ◀

No entry for application number: 003886256.

---

Disclaimer and Copyright I

**ANNEX 2**

`



# Membership Terms and Conditions

These Membership Terms and Conditions apply where You choose to register as a Member of this website (the **"Site"**). This Site and the related gaydar, rainbownetwork, gaydargirls, gaydarradio and mygaydar sites are offered to you (**"Your"**/**"You"**) by QSoft Consulting Limited (P.O. Box 113, Twickenham TW1 4WY) and its subsidiary companies.

**Please read these Membership Terms and Conditions carefully before registering on the Site as a Member. If You do not agree to these Membership Terms and Conditions, then You SHOULD NOT register as a Member.**

**1. Acceptance of Membership Terms and Conditions**
1.1 By clicking "Accept" to register You will be deemed to have consented to these Membership Terms and Conditions.
1.2 We reserve the right to change or update these Membership Terms and Conditions from time to time (subject to Your termination right pursuant to paragraph 8). Any revisions to these Membership Terms and Conditions will be notified to You the next time that You log on to the Site as a Member.

**2. Description of Membership and Subscription**
2.1 As a Member, You can take advantage of many services on the Site for free. However other areas of the site require payment of a Member subscription. For a full description of the services offered on this Site and the subscription options for Members, please follow and consult the **Benefits of Membership** page.
2.2 Member subscription payments can be made in UK Sterling, Euros or Dollars.
2.3 Please note that any Member subscription paid by You is subject to a minimum contractual period of one month.
2.4 Our VAT number is 809769283.

**3. Age of Consent**
3.1 You must be **18 years or over** to register as a Member. If We discover or have any reason to suspect that You are not over 18 years of age, then We reserve Our right to suspend or terminate Your Membership to this Site immediately and without notice.

**4. Password Member Name and Security**
4.1 Upon registration as a Member, You will select a Password and Member Name that You can use to access Your Member Account and Profile and to log on to the Members' area of the Site.
4.2 You are responsible for maintaining the confidentiality of Your Password and Member Name and are responsible for all activities that occur under them. We do not have the means to check the identity of people using the Members' area of the Site and will not be liable where Your Password or Member Name are used by someone else.
4.3 You agree to notify Us immediately of any unauthorised use of Your Password or Member Name or any other breach of security of which You become aware.

**5. Your warranties**
5.1 You warrant that:
5.1.1 You are over 18 years of age;
5.1.2 all information and details provided by You to Us (including on registration as a Member) are true, accurate and up to date in all respects and at all times (see Our **Privacy Policy** for details on how to update Your personal data); and
5.1.3 You will comply with these Membership Terms and Conditions including, without limitation, the restrictions relating to acceptable use set out at section 6 below.
5.2 You agree to indemnify and hold Us harmless from any claim or damages (including any legal fees in relation to same) made by a third party in respect of any matter in relation to or arising from Your use and Membership arising from any breach or suspected breach of these Membership Terms and Conditions by You or Your violation of any law or the rights of any third party.

**6. Acceptable Use**
**6.1 We support the free flow of information and ideas over the Internet and do not actively monitor use of the Site, including the Members' area under normal circumstances. We seek to balance this aim with Our obligations to other Members and at law however. We do therefore review all profiles entered onto the Site by Members, check instant messages where certain keywords are triggered and log chatroom exchanges in order to ensure compliance with these terms, and to comply with or investigate any enforcement agency or police request or complaints. We also therefore require that You do not:**
6.1.1 say or do anything that would cause annoyance, inconvenience, harassment or needless anxiety to others;
6.1.2 advertise or promote third party or Your own products or services including by way of the distribution of 'spam' mail;

6.1.3 use foul, threatening or offensive language including, without limitation, racist, sexist, ageist, homophobic or sexually explicit language where inappropriate;

6.1.4 make insulting remarks to or about other Members ("flaming");

6.1.5 jump in and out of Site forum rooms ("frogging");

6.1.6 distribute illegal, copyright infringing, indecent or offensive material or any messages or content that may incite disorder or encourage illegal activities or that causes or may cause harm to minors;

6.1.7 impersonate another person or Member;

6.1.8 transfer files that contain viruses, trojans or other harmful programs;

6.1.9 use the Site to conduct any fraudulent activity including any "pyramid scheme"; "ponzi scheme" or "chain letter";

6.1.10 access or attempt to access the accounts of other Members or to penetrate or attempt to penetrate the Site security measures;

6.1.11 have more than one Member Account at any time.

6.2 We may take any or all of the following action at Our discretion:

6.2.1 remove any Member profile (including photographs) or other material that, in Our sole discretion may be inappropriate or We suspect to be illegal, subject Us to liability or which may violate these Membership Terms and Conditions or where required to do so by law;

6.2.2 issue Members with verbal or written warnings and may take such further action as We deem appropriate under this paragraph 6.2 if such warnings are not heeded;

6.2.3 suspend or terminate a Member's access to the Members' area of the Site or a Member's Account without notice at any time;

6.2.4 inform the appropriate authorities and provide them with information regarding any suspected illegal activity; or

6.2.5 bring legal action against a Member or other user of the Site in relation to any breach of these Membership Terms and Conditions or any illegal or suspected illegal activity.

**We will determine what action is appropriate to be taken against a Member on a case by case basis.**

6.3 You acknowledge that We may be required by law or regulation to access, monitor, store or copy material sent by or to Members without further notice to You.

## 7. Cancellation

7.1 Your Membership services commence immediately when You submit Your registration, or subscription. This means that, subject always to Your right to terminate as set out below, You will not be able to cancel the services after this point.

## 8. Termination of Membership

8.1 Subject to paragraph 8.2 below, You can terminate Your Membership at any time by notifying Us at **support@gaydar.co.uk**

8.2 Please note that any Member subscription paid by You is subject to the minimum contractual period of one month. This means that, where You choose to terminate Your Member subscription before the expiry of this period, You will not receive any refund in respect of this minimum contractual period.

8.3 No refunds will be paid by Us where Your Membership is terminated by Us as a consequence of Your breach of these Membership Terms and Conditions.

## 9. Copyright and Other Intellectual Property Rights

9.1 Your use of the Site grants no rights to You in relation to copyright, trade marks or other of Our intellectual property rights or the intellectual property rights of third parties.

9.2 You may not, without limitation, copy, reproduce, republish, download, post, broadcast, record, transmit, commercially exploit, communicate to the public, or otherwise use the content included in or provided via the Site except for Your own personal, non-commercial use. Subject to the above, You may download insubstantial excerpts of this content to Your hard disk for the purpose of viewing it provided that no more than one copy of any information is made.

## 10. Limitation of Liability

10.1 Whilst We will use all reasonable endeavours to correct any errors or omissions as soon as practicable once they have been brought to Our attention, We do not warrant that the Site will be available uninterrupted and in a fully operating condition nor that the information on and provided via the Site will be free from errors or omissions.

10.2 Access to this Site and its contents may be suspended temporarily and without notice in the case of system failure, necessary maintenance or repair or for reasons beyond Our control.

10.3 Save that nothing in this paragraph 10 shall restrict Your statutory rights (including Your right to receive a reasonable standard of service), all content and services on this Site are provided on an 'as is' and 'as available' basis. We do not make any representation or give any warranty in respect of the Site or its content, including, without limitation information provided by or regarding other Members. We can not vet all Member profiles and entries to ensure that they are appropriate or correct. **Any decision made or action taken by You on the basis of information provided on or via the Site is at Your sole discretion and risk.**

10.4 Due to the fact that many technical aspects of the Site and the content provided herein is supplied by or otherwise dependent on third parties, We do not give any warranty as to the accuracy, suitability, reliability, completeness, performance, satisfactory quality, fitness for a particular purpose, or freedom from viruses, or other harmful programs of the content contained in or accessed through this Site.

10.5 We will not be liable for any damages, including indirect or consequential losses and whether in contract, tort (including negligence) or otherwise, arising in connection with any use by You or other Members of the Site that is in

contravention of these Membership Terms and Conditions or is not directly attributable to Our negligence. Where We are liable for direct loss this will be limited to a maximum of the total price of the Member Subscription paid to Us by You in the 6 months prior to the claim.

10.6 Nothing in these Terms and Conditions shall exclude or limit Our liability for death or personal injury caused by Our negligence.

## 11. Security and Privacy

11.1 Your security and those of all Our Members is very important to Us. Please read Our **Privacy Policy** for important information regarding the use of Your personal data and Your rights in relation to this.

## 12. General

12.1 We shall not be liable for any failure for any suspension, or termination of access to the Site or any content arising out of a force majeure event. A force majeure event shall include, without limitation, failure of infrastructure, government intervention, wars, civil commotion, hijacking, fire, flood, accident, storm, strikes, lockouts, terrorist attacks, or industrial action affecting Us or Our suppliers.

12.2 If any of these Membership Terms and Conditions are determined to be illegal, invalid or otherwise unenforceable by reason of law then to the extent and within the jurisdiction in which that term is illegal, invalid or unenforceable, it shall be severed and deleted from these terms and the remaining terms shall survive, remain in full force and effect and continue to be binding and enforceable.

12.3 These Membership Terms and Conditions shall be governed by and interpreted in accordance with the laws of England. Disputes arising in connection with these terms shall be subject to the exclusive jurisdiction of the courts of England and Wales.

## 13. Complaints and Feedback

13.1 If You have any complaints about another Member or any aspect of the Site or if You have any questions or would otherwise like to provide any other feedback, then You can contact Us by emailing: **support@gaydar.co.uk** or writing to us at the address set out at the top of these terms.

**Commercial Membership Terms and Conditions**

Designed by QSoft Consulting Ltd. © 1999-2006 QSoft Consulting Ltd. All rights reserved.

**UNDERTAKINGS**

To:    QSoft Consulting Limited

c/o Olswang

90 High Holborn

London WC1V 6XX

[Date] 2006

Dear Sirs,

**Community Trade Mark Registration No 3804168 in Classes 38 and 41**

**Community Trade Mark Registration No 2127264 in Classes 35, 38 and 42**

**Community Trade Mark Registration No 3886256 in Classes 35, 38, 41 and 45.**

**for the mark GAYDAR in the name of QSoft Consulting Limited**

**Domain names –** www.gaydarboys.net**,** www.gaydarcams.net **and** www.mygaydar.com

I refer to the letter from your solicitors, Messrs Olswang, to us dated 24 November 2006 ("the Letter").

In consideration of your not commencing proceedings against me for the reasons set out in your Letter I hereby undertake, whether acting on my own behalf, or by employees, servants, agents or any of them howsoever, and whether directly, or indirectly:

1.  neither now or at any time in the future to apply a sign (which shall include without limitation GAYDAR or any similar sign) to any services or domain name which would amount to an infringement of the Trade Marks;

2.  neither now or at any time in the future to register or apply to register any domain name including the mark GAYDAR or any similar sign.

3.  to cease using the domain name listed above;

4.  to assign the domain name above and any other domain names incorporating your marks to QSoft Consulting Limited or another company in the same group as requested.

5.  to immediately cease sending or instigating the sending of, and shall not in the future send or instigate the sending of, unsolicited emails or other correspondence to Gaydar Users;

6.  to immediately cease any membership of your websites, and shall not in the future, without your express written permission, create any profile or new membership on your websites, including but not limited to gaydar.co.uk;

7.  that within 7 days from the signature of these undertakings I shall provide details of all profiles created by me and/or my company on your websites, including but not limited to gaydar.co.uk; and

8.  within 7 days from the signature of these undertakings to provide to you an Affidavit sworn by a properly authorised officer, verifying the correctness of the information supplied under paragraph 7 above and confirming that the obligations imposed by paragraphs 1-7 above have been fully complied with.

Yours faithfully

_____

Mr Teddy Tong

Signed in his personal capacity and for and on behalf of the businesses operated from the websites www.gaydarboys.net, www.gaydarcams.net and www.mygaydar.com.

# EXHIBIT 6

# Greenberg
# Traurig

Paul D. McGrady, Jr.
312.456.8426 telephone
312.899.0407 facsimile
mcgradyp@gtlaw.com

**VIA FEDERAL EXPRESS**

Mr. Teddy Tong
Lengting Ave. 14-51
San Francisco, California 94104

-and-

45 10-th ave #19
Princeton, New Jersey 08540

**ALSO VIA EMAIL**:
undoblewsolebeside@yahoo.com;
maneflauntaloud25@yahoo.com;
canvasfaintdiseasedb@yahoo.com
avraam02@yahoo.com

RE:    **QSoft Consulting Limited**
       **Objection to acts of cybersquatting and trademark infringement,**
       **violations of CAN-SPAM, and the Computer Fraud & Abuse Act,**
       **among others all by Teddy Tong**

Dear Mr. Tong:

We represent QSoft Consulting Limited ("QSoft"). As you are aware, QSoft is the owner of GAYDAR and GAYDAR related marks (collectively the "GAYDAR MARKS"). The GAYDAR MARKS are protected via trademark registrations and also at common law. As you are also aware, QSoft is the operator of the <gaydar.co.uk> website and its associated websites. I am writing you on behalf of QSoft because you are the registrant, as well as the administrative and technical contact for the following infringing domain names (collectively, the "Infringing Domains"):

<gaydarboys.net>

<gaydarcams.net>

<myqaydar.com>

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DELAWARE

DENVER

FORT LAUDERDALE

HOUSTON

LAS VEGAS

LOS ANGELES

MIAMI

MILAN*

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

ROME*

SILICON VALLEY

TALLAHASSEE

TOKYO*

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

ZURICH

*Strategic Alliances
Tokyo-Office/Strategic Alliance

Mr. Teddy Tong
May 30, 2007
Page 2

The above mentioned unauthorized activity by you violates QSoft's exclusive rights in its famous marks under the federal Lanham Act under Title 15 of the United States Code, Section 1125, among others, and applicable state law. Others are likely to be deceived and to mistakenly assume that there is a common source or origin, affiliation or sponsorship of you based upon your misuse through unauthorized registration and use of a domain name containing the GAYDAR MARKS. This misuse also blurs and tarnishes the distinctive character of the GAYDAR MARKS, and constitutes cybersquatting and cyberpiracy under the U.S. federal Anti-Cybersquatting Consumer Protection Act. Your violation of these laws has exposed you to liability of up to $100,000 per domain name registered, as well as liability for treble the profits which you have wrongfully obtained or treble the damages QSoft has suffered through your acts of trademark infringement.

Further, it has come to our client's attention that you have registered multiple accounts on gaydar.co.uk and that you have used these accounts in conjunction with the Infringing Domains and at least one other domain name (<myrealjocks.com>) to send a large number of unsolicited messages to Gaydar Members via private chat rooms ("Spam"). These messages advertise and link Gaydar Members to your various websites which consist of pornographic advertisements for a competing online community, <www.ifriends.com>.

This unauthorized activity by you violates the federal Can-Spam Act, 15 U.S.C. § 7701 et seq., prohibiting the transmission of unsolicited commercial electronic messages. Also, because your activities are unauthorized and in clear violation of the Gaydar Website Terms of Use, your activities violate the federal Computer Fraud and Abuse Act prohibiting unauthorized access to computers.

Further, your activities constitute a breach of contract under the terms and conditions of the <gaydar.co.uk> website. As you are keenly aware, prior to using any Gaydar services, including the Gaydar chat room and private chat service, you agreed to comply with the Gaydar Website Terms of Use. Specifically, the Gaydar Website Terms of Use include the following relevant provisions:

> 6.1    We also therefore require that You do not:
> 6.1.1  say or do anything that would cause annoyance, inconvenience, harassment or needless anxiety to others;
> 6.1.2  advertise or promote third party or Your own products or services including by way of the distribution of spam mail;
> 6.1.5  jump in and out of Site forum rooms ("frogging');
> 6.1.11 have more than one Member Account at any time.

By engaging in the conduct described above, you have breached each of these obligations.

Mr. Teddy Tong
May 30, 2007
Page 3

Accordingly, on behalf of QSoft, we now formally demand that you promptly do the following to resolve this matter:

1.  Provide a written undertaking that you, and any and all parties acting in concert with you, will forever cease and desist from all use of the GAYDAR MARKS and any marks confusingly similar to such marks;

2.  Promptly unlock, provide us with the Authorization Codes, and a consent to an electronic transfer request for each of the Infringing Domains;

3.  Provide a written undertaking that you, and any and all parties acting in concert with you, will forever cease and desist from access to and use of the <gaydar.co.uk> website and any related websites, including but not limited to acts of transmitting Spam;

4.  Provide an accounting to us of all your profits related to these activities;

5.  Provide us with a written, full description of your activities including the name and full contact information of all parties acting in concert with you and a description of their involvement in your activities; and

6.  Provide us with your written and reasonable proposal for payment from you to our client of a reasonable amount to compensate our client for its damages resulting from your activities.

To prepare for the contingency of litigation, you are directed to retain all documents and all electronically-stored information (including, without limitation, all electronic information stored or residing on or in e-mail files, web logs, database files, file servers, zip drives, and back-up tapes) related to this matter and to notify any other entities involved in your activities, to do the same.   Such parties include but are not limited to your hosting provider(s), your registrar(s), all parties who appear on your websites, and all parties whose goods or services your website promote.

This letter is written without prejudice to any claim for damages or other relief that our client may have in the event that litigation against you might prove necessary.  The foregoing is not a complete statement of the facts or of our client's position or potential claims or causes of action against you, and our

Mr. Teddy Tong
May 30, 2007
Page 4

client specifically reserves all of its rights and remedies relating to your activities. Kindly let us hear from you by <u>Tuesday, June 5, 2007</u>.

Very truly yours,

Paul D. McGrady, Jr.
GREENBERG TRAURIG LLP

JBE

# EXHIBIT 9

SEND, ENTER

FEB 2 8 2007

CLERK, U.S. DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-3391-RGK (JCx) | Date | February 27, 2007 |
|---|---|---|---|

| Title | *MYSPACE, INC. v. THE GLOBE.COM, INC.* |
|---|---|

Present: The Honorable   R. GARY KLAUSNER, U.S. DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    **(IN CHAMBERS) Plaintiff's Motion for Summary Adjudication of Counts 1, 3, and 4 of the Complaint (DE 36) and Defendant's Motion for Partial Summary Judgment (DE 32)**

## I.    INTRODUCTION

MySpace, Inc. ("Plaintiff" or "MySpace") filed the current action against The Globe.com, Inc. ("Defendant" or "TheGlobe"). Plaintiff's Complaint alleges: (1) Violations of the CAN-SPAM Act, 15 U.S.C. §§ 7701, et seq.; (2) Violations of the Lanham Act, 15 U.S.C. §§ 1051, et seq.; (3) Violations of California Business and Professions Code Section 17529.5 ("Section 17529.5"); (4) Trademark Infringement under California Business and Professions Code Section 14200, et seq.; (5) False Advertising under California Business and Professions Code Section 17500, et seq.; (6) Breach of Contract; (7) Breach of the Covenant of Good Faith and Fair Dealing; (8) Unfair Competition under California Business and Professions Code Section 17200, et seq.; and (9) Common Law Unfair Competition.

Presently before this Court are cross-motions for partial summary judgment. Both Plaintiff and Defendant seek summary judgment as to Counts I (Violation of CAN-SPAM), III (Violation of Section 17529.5) and VI (Breach of Contract).

## II.    FACTUAL BACKGROUND

The following facts are alleged by the parties:

Plaintiff is an online social networking service that allows members to create personal profiles in order to find and communicate with other people. Members of MySpace have access to the MySpace.com website, the MySpace.com Internet Messaging service, and the MySpace.com Mail service, where users can send and receive electronic mail messages ("MySpace e-messages").

To become a MySpace member, a person must set up an account on MySpace.com by creating a profile. The profile includes the user's name, country, zip code, birth date, and gender. The user must also create a password and provide an alternate email address to which confirmations and notifications will be sent. To set up an account, the user must assent to the MySpace Terms of Service Contract ("TOS Contract") by checking a box agreeing to the terms of the TOS Contract, and inputting a verification code. The TOS Contract prohibits spamming, automated use of its system, use of MySpace's service for commercial endeavors, and promotion of information known to be false or misleading.

A MySpace member accesses his e-message account on the internet, at the MySpace.com website. To send a MySpace e-message, the user may either click on a link for "Mail," or go directly to the recipient's unique URL assigned to each individual account.

Defendant is a public company that provides internet-based communications services ("TGLO Products"). Defendant operates one or more websites under various domain names, including glochat.com, tglophone.com, glotalk.com and digitalvoiceglo.com.

Beginning January 2006, Defendant set up at least 95 identical or virtually identical "dummy" MySpace profiles, with corresponding e-message accounts. Defendant used these accounts to send almost 400,000 unsolicited commercial e-messages marketing TGLO Products to MySpace users via scripts.[1] On February 6, 2006, Plaintiff sent a cease and desist letter to Defendant, demanding that Defendant stop sending its commercial e-messages to MySpace members. Thereafter, Defendant ceased its transmission of e-messages. However, the transmissions later resumed and continued through May 2006.

On June 1, 2006, Plaintiff filed the current action against Defendant. In its Complaint, Plaintiff alleges that Defendant's activities violated both federal and state statutory laws, as well as state common laws. By way of its action, Plaintiff seeks an order enjoining Defendants from the conduct giving rise to Plaintiff's claims. Plaintiff also seeks actual damages, liquidated damages, punitive damages, and attorney's fees and costs.

## II.    JUDICIAL STANDARD

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). Upon such a showing, the Court may grant summary judgment as to "all or any part thereof." Fed. R. Civ. P. 56(a), (b).

To prevail on a summary judgment motion, the moving party must show there are no triable issues of fact as to matters upon which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the nonmoving party's case. Id. at 326.

---

[1] A script is a computer programming language used to automate simple, repeated actions.

To defeat a summary judgment, the non-moving party may not merely rely on its pleadings or on conclusory statements. Fed. R. Civ. P. 56(e). Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). The non-moving party must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial. *See Celotex Corp v. Catrett*, 477 U.S. at 324.

## III.   DISCUSSION

At issue in these cross-motions are Count I (Violation of CAN-SPAM), Count III (Violation of Section 17529.5) and Count VI (Breach of Contract).

According to Plaintiff, there is no triable issue as to the following alleged facts: Defendant obtained 95 or more MySpace e-message accounts to circumvent MySpace's daily mail limitations. To obtain these accounts, Defendant set up almost 100 separate email accounts at sites such as hotmail.com to fulfill MySpace's requirement of providing an alternate email address. Then, Defendant used false information to set up the MySpace accounts with deceptive display names, and purported to use them for personal purposes. In fact, the accounts were used to initiate (via a script) 399,481 unsolicited commercial email messages to MySpace.com users to promote its TGLO Products. Plaintiff asserts that, as a result of this conduct, partial summary judgment should be granted in its favor as to all three counts.

Defendant contends that: (1) Plaintiff has no standing under CAN-SPAM because it is not an ISP; (2) the messages sent over its private messaging system are not e-mail, and therefore neither CAN-SPAM nor Section 17529.5 apply; and (3) the TOS Contract, in general, is an unenforceable contract of adhesion, and the liquidated damages provision, specifically, is unenforceable because it is disproportionate to anticipated damages.

For the following reasons, the Court denies Defendant's Motion for Partial Summary Judgment, and grants in part, Plaintiff's Motion for Summary Adjudication.

### A.   Claims Under CAN-SPAM

CAN-SPAM regulates the manner in which unsolicited commercial emails may be transmitted. *See* 15 U.S.C. §§ 7701, et seq. The statute also makes unlawful certain conduct relating to such transmissions, including the transmission of false or misleading information, and obtaining email addresses through dictionary attacks.[2] 15 U.S.C. §§ 7704(a) - (d). Under CAN-SPAM, an Internet access service provider who is harmed by violations of Section 7704(a), (b) or (d) may seek to enjoin further violation by the defendant, or recover damages equal to the greater of: (1) actual monetary loss incurred by the internet access service provider or (2) statutory damages as provided by Section 7706(g)(3).

Plaintiff alleges that, based on its conduct, Defendant is liable for four separate violations under the statute:

(1)   Section 7704(a)(1): transmission of commercial email that contain false or misleading information, including header information;

(2)   Section 7704(a)(2): pattern or practice of transmitting commercial email with deceptive subject headings;

---

[2] Dictionary attacks involve obtaining email addresses using an automated means that generates possible addresses by combining names, letter, or numbers into numerous permutation.

(3)    Section 7704(a)(5): pattern or practice of transmitting commercial email which omits identifier, opt-out and physical address information; and

(4)    Section 7704(b)(1): using automated means, such as scripts, to generate commercial email to random recipients.

As discussed below, the Court finds no triable issue as to Defendant's violation of the following three our of four provisions: Sections 7704(a)(1), 7704(a)(5) and 7704(b)(1)(A)(ii).

1.    *Plaintiff Has Standing Under CAN-SPAM*

As an initial matter, CAN-SPAM, which is primarily a criminal statute, authorizes a private right of action only to a "provider of Internet access service." 15 U.S.C. § 7706(g)(1). Defendant contends that Plaintiff is not a provider of Internet access service, and therefore, has no standing to sue Defendant under the statute.

a.    *Plaintiff is an Internet Access Provider*

Under Section 7702(11), "Internet access service" has the meaning given that term in 47 U.S.C. § 231(e)(4) ("Section 231"). Section 231 defines "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers."

The Ninth Circuit assumes that the legislative purpose of a statute is expressed by the ordinary meaning of the words used. *Leisnoi, Inc. v. Stratman*, 154 F.3d 1062, 1066 (9th Cir. 1998). The plain meaning of the statutory language is unambiguous; "Internet access provider" includes traditional Internet Service Providers ("ISPs"), any email provider, and even most website owners. *See White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 373 (5th Cir. 2005); *see also Hypertouch v. Kennedy Western*, 2006 WL 648688 at *3 (N.D. Cal. Mar. 8, 2006). Under this broad definition, Plaintiff is an "Internet access provider."

b.    *MySpace E-Messages Are Electronic Mail*

Notwithstanding the broad definition given to "Internet access provider," CAN-SPAM provides a private right of action to only those Internet access providers who are adversely affected by Section 7704. Since Section 7704 regulates and prohibits conduct involving electronic mail ("electronic mail" or "email"), a private right of action under CAN-SPAM is confined to only those Internet access services that provide access to electronic mail.

CAN-SPAM defines "electronic mail message" as "a message sent to a unique electronic mail address." 15 U.S.C. § 7702 (6). "Electronic mail address" is defined as "a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the 'local part') and a reference to an Internet domain (commonly referred to as the 'domain part'), whether or not displayed, to which an electronic mail message can be sent or delivered." 15 U.S.C. § 7702(5).

According to Plaintiff's evidence, the mail of each MySpace user resides at a unique URL, consisting of a string of characters that includes a reference to a user name or number, and the Internet destination, www.myspace.com. (Ballon Suppl. Decl., Exh.C.2, Whitcom Depo., 71:17-24; Ballon Decl., Tab 4, Wells Decl., ¶ 7.) This evidence shows that MySpace e-messages fall under CAN-SPAM's definition of electronic mail, and Defendant has failed to present any evidence disputing Plaintiff's evidence.

However, Defendant maintains that MySpace e-messages do not constitute CAN-SPAM protected email because: (1) unlike email, MySpace e-messages have no real "route" because the messages always remain within the "walled garden" of MySpace; (2) MySpace e-messages are not email because they do not use simple mail transfer protocol ("SMTP"); and (3) unlike email addresses, MySpace e-message addresses have no domain part. Defendant's arguments are unavailing.

First, nowhere does the statute specify the requirements set forth by Defendant.[3] Moreover, argument as to these requirements are part and parcel of Defendant's position that only traditional ISPs have a right to sue under CAN-SPAM, as these requirements are typically associated with email service provided by traditional ISPs. As discussed above, the Court rejects this position. Furthermore, CAN-SPAM's Congressional findings indicates that exclusion of electronic messages that fall outside the ambit of Defendant's specifications would subvert the legislative intent. Regardless of who has a private right of action under the statute, the overarching intent of this legislation is to safeguard the convenience and efficiency of the electronic messaging system, and to curtail overburdening of the system's infrastructure. *See* 15 U.S.C. § 7701(a). Limiting protection to only electronic mail that falls within the narrows confines set forth by Defendant does little to promote the Congress's overarching intent in enacting CAN-SPAM.

Nonetheless, Plaintiff has introduced evidence showing: (1) its e-message system uses both a routing method and a domain part, and (2) some MySpace e-messages are transmitted using STMP. First, according to Plaintiff's evidence, every message must contain routing information letting MySpace servers know where to send that message. (Whitcom Decl., ¶ 4.) While the routing employed by MySpace may be less complex and elongated than those employed by ISPs, *any* routing necessarily implicates issues regarding volume of traffic and utilization of infrastructure – issues which CAN-SPAM seeks to address. Similar to an ISP, there is only a finite volume of mail that MySpace can handle without further investment in infrastructure. Second, Plaintiff's evidence shows that each user's mailbox includes a reference to, not only a user name, but also to myspace.com, the Internet domain or domain part. (Ballon Suppl. Decl., Exh.C.2, Whitcom Depo., 71:17-24; Ballon Decl., Tab 4, Wells Decl., ¶ 7.) Finally, Plaintiff's evidence shows that, while most MySpace e-messages are sent using Hypertext Transfer Protocol ("HTTP"), each time an HTTP message is sent by a MySpace user, a companion notification message is sent via SMTP to the recipient's alternative email address. (Whitcomb Decl., ¶ 5.) Additionally, MySpace users may send SMTP messages over the Internet from myspace.com when they invite someone who is not a MySpace member to join MySpace. (Whitcomb Decl. ¶ 6.) Defendant has not presented any evidence to dispute the evidence set forth above. Therefore, Defendant's argument fails, even under its improperly narrow interpretation of the statute.

Based on the foregoing, the Court finds that Plaintiff has standing to sue Defendant under CAN-SPAM because, as defined under CAN-SPAM, Plaintiff is an Internet access provider whose electronic messages qualify as electronic mail.

---

[3] While the statute references the phrase "domain part," it is clearly not a required element, but merely used to illustrate how an electronic mail address is commonly expressed.

2.    *Violation of Section 7704(a)(1)*

Section 7704(a)(1) prohibits the transmission of commercial email that contains false or misleading header information.[4] Under the statute, even if the header information is technically accurate, it is considered materially misleading if it includes an originating email address that was accessed through false or fraudulent pretenses, for purposes of initiating the commercial email message. 15 U.S.C. § 7704(a)(1)(A).

According to Plaintiff's evidence, Defendant's employees created MySpace accounts using false identifying information, including fictitious email addresses and contact information. (Ballon Decl., Tab 8, Fowler Depo., 185:4-21; Ballon Decl., Tab 11, Nelson Depo.34:4-35:8, 37:16-19, Exh. 2.). Defendant's employees also set up MySpace accounts with the display names, "MySpace Phone," "Chick," and "Coppermine." (Ballon Decl., Tab 3, Kaleel Decl., ¶¶ 7 and 12, Exh. C; Ballon Decl., Tab 10, Mobley Depo., 37:23-38:10.) As indicated by this evidence, the accounts created by Defendant failed to identify the messages as originating from TheGlobe. Based on the plain language of Section 7704(a)(1), Plaintiff's evidence establishes that Defendant violated this provision.[5]

In opposition, Defendant argues that the accounts did, in fact, identify TheGlobe as the originator of the e-messages. To support its argument, Defendant has introduced evidence that a document was used to assist employees in creating MySpace accounts. According to this evidence, the document instructed the employees to use "tglo" in the first name and "phone" as the last name. (Elliot Decl., Exh. 13, Nelson Depo., 34:4-25.) This evidence is unavailing, as it fails to dispute Plaintiff's evidence or otherwise support its proposition. At most, the evidence indicates that, in addition to the false accounts described by Plaintiff's evidence, some of Defendant's other accounts may have had as their account identifiers the words "tglo" and "phone," the product Defendant sought to market. Even so, this fact is irrelevant because Defendant has not offered any evidence showing that those words are readily associated with TheGlobe or its TGLO Products. As such, the Court finds no triable issue as to Defendant's violation of Section 7704(a)(1).

3.    *Violation of Section 7704(a)(2)*

Section 7704(a)(2) prohibits a person from transmitting commercial email containing a subject heading that he or she knows would likely mislead the recipient about a material fact regarding the content or subject matter of the message. Under Section 7706(g)(1), a private right of action under Section 7704(a)(2) is available only when there is a pattern or practice that violates this provision.

It is undisputed that Defendant sent MySpace e-messages with the subject headings, "the new MySpace phone," "the new phone for MySpace," and "the new tglo phone for MySpace." (Ballon Decl., Tab 8, Exh. 33; Ballon Decl., Tab 3, Kaleel Decl., ¶ 4; Ballon Decl., Tab 4, Wells Decl., ¶ 17.) The last heading does not violate the statute, as it references "tglo" in a way that accurately describes the content

---

[4] "Header information" means "the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail message, and any other information that appears in the line identifying . . . a person initiating the message." 15 U.S.C. § 7702(8).

[5] In its Opposition, Defendant argues that Section 7704(a)(1) only prohibits sending emails containing header information that makes the email appear to come from an address other than the one from which it actually came. Again, the Court finds Defendant's interpretation far too narrow and unsupported by the provision's plain language.

of the message and implies a product that is separate and distinct from MySpace. In contrast, the first two headings do violate the statute because they imply an affiliation with MySpace, likely misleading the recipient into believing that the marketed product is related to MySpace. In fact, it is undisputed that in late January 2006, an influential technology blogger on Zdnet.com inaccurately reported that MySpace had partnered with TheGlobe. (Ballon Decl., Tab 1, Exh. E; Ballon Decl., Tab 15, Cespedes Depo., 52:1-17, 56:2-24.). Although Defendant was aware of this error, it never sought to correct the misinformation. (Ballon Decl., Tab 15, Cespedes Depo., 58:15-24.) Significantly, the undisputed evidence shows that the subject headings described above were attached to e-messages sent *after* Defendant learned of the blogger's inaccurate report. (Ballon Decl., Tab 15, Cespedes Depo., 51:17-52:1-6.) As such, the Court finds that Defendant knew, or should have known, that its subject headings were misleading.

Defendant argues that Plaintiff fails to show a pattern or practice. As to this provision, the Court agrees. The undisputed evidence shows that Defendant's employees were provided written instructions on how to create MySpace accounts and what content to send through the messaging system. (Ballon Decl., Tab 11, Exh.2.) The instructions directed the employees to use "Call for FREE fast and easy" as the headline. (Ballon Decl., Tab 11, Exh. 2, D-00003909.) This subject heading is consistent with the email content, and does not violate Section 7704(a)(2). As discussed above, notwithstanding the written instructions, as least a portion of the 399,481 e-messages sent by Defendant contained deceptive subject headings that violated the statute. However, without further evidence as to the number of such e-messages sent by Defendant, it is impossible to determine whether Defendant's violation of this provision rose to the level of a pattern or practice. Therefore, a triable issue of fact exists as to whether the number of e-messages containing deceptive subject headings is substantial enough to constitute a pattern or practice.

4.    *Violation of Section 7704(a)(5)*

Section 7704(a)(5) requires that unsolicited commercial emails contain: (1) clear notification that the message is an advertisement, (2) clear notice of the opportunity to decline receipt of further messages from the sender, and (3) a valid physical postal address for the sender. Again, under Section 7706(g)(1), a private right of action under Section 7704(a)(5) is available only when the defendant has a pattern or practice of violating this provision.

It is undisputed that none of Defendant's 399,481 e-messages contained clear notice of the opportunity to decline receipt of further messages from the sender,[6] or a valid physical postal address for the sender. (Separate Statement of Uncontroverted Material Facts ("UMF"), ¶¶ 14 and 15; Defendant's Statement of Genuine Issues.) Therefore, Defendant clearly violated this statutory provision.

Again, Defendant argues that its activities do not constitute a pattern or practice, as prescribed by Section 7706(g)(1). However, as stated above, the following is undisputed: (1) Defendant's employees were given instructions on how to create a MySpace account, what information should be placed in the profiles, and what content to write in the messages (Ballon Decl., Tab 8, Exh. 33.); and (2) through its employees, Defendant created at least 95 MySpace accounts and sent 399,481 unsolicited commercial emails over a course of five months. (Ballon Decl., Tab 4, Wells Decl. ¶ 8; Ballon Decl., Tab 11, Nelson

---

[6] In its Statement of Genuine Issues, Defendant attempts to dispute this fact by stating that MySpace provides a mechanism for users to opt out of receiving further messages from a particular sender. However, this fact is irrelevant, as it fails to dispute Plaintiff's evidence and, in any case, fails to comport with the statutory requirement that clear notice of a recipient's ability to decline further messages be provided in the original email.

Depo., 22:5-9; Ballon Decl., Tab 10, Mobley Depo., 10:12-11:2; Ballon Decl., Tab 8, Fowler Depo., 168:5-169:25.) This evidence shows that, rather than an isolated or accidental event, Defendant sent these e-messages in a regular and repeated fashion, as a part of Defendant's marketing practice. Since each one of the 399,481 messages violated Section 7704(a)(5), Plaintiff has shown that Defendant engaged in a pattern or practice of violating this provision. As such, the Court finds no triable issue of fact as to Defendant's liability for violation of Section 7704(a)(5).

    5.    *Violation of Section 7704(b)(1)*

        Section 7704(b) makes it an aggravated violation to initiate the transmission of commercial email that is unlawful under Section 7704(a) where "the electronic mail address of the recipient was obtained using an automated means that generates possible electronic mail addresses by combining names, letter or numbers into numerous permutation." 15 U.S.C. § 7704(b)(1)(A)(ii).

        Plaintiff's evidence shows that Defendant randomly selected a range of MySpace ID numbers. Defendant then used a script to automatically generate a set of sequential IDs. Once these IDs were generated, the script automatically transmitted Defendant's messages to those IDs. (Ballon Decl., Tab 8, Fowler Depo., 54:14-57:11.) According to the evidence, some of the IDs correlated to MySpace profiles, and some did not. (Ballon Decl., Tab 8, Fowler Depo., 55:1-20.) A total of 399,481 messages were sent using this script. (Ballon Decl., Tab 8, Fowler Depo.,170:3-16.) Based on the evidence presented, Defendant violated Section 7704(1)(A)(ii).

        In opposition, Defendant argues that it did not violate the statutory provision because the script sent messages in sequence, rather than at random. Defendant further argues that the script sent the messages to a range of MySpace profiles by using a range of user IDSs that had already been assigned by MySpace. Defendant's arguments are unavailing, as it is unclear how these distinctions change the fact that Defendant used "automated means that generates possible electronic mail addresses." As such, the Court finds no triable issue as to Defendant's violation of Section 7704(b)(1)(A)(ii).

**B.    Section 17529.5 Claim**

        Section 17529.5 prohibits email transmissions to or from California email addresses containing "falsified, misrepresented or forged header information" or a subject line that would likely "mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." Section 17529.5(a)(2) and (3). Under the statute, an electronic mail service provider[7] may bring an action against a person or entity that violates this section.

        It is undisputed that MySpace's servers, which house all MySpace.com e-message accounts, are located in California. (Ballon Decl., Tab 2, Boster Decl., ¶ 2.) Furthermore, it is undisputed that every time a user logs on to MySpace.com to send, review or reply to an e-message, he or she is doing so by accessing the California servers. (Kaleel Decl., ¶ 3.) Based on this evidence, as well as the evidence and anyalsis discussed in Section III.A. above, the Court finds no triable issues as to Defendant's liability for Plaintiff's Section 17529.5 claim.

---

        [7] An "electronic mail service provider" is defined as "any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail." Section 17529.1(h).

C.    **Breach of Contract Claim**

To set up a MySpace account, a person must assent to the TOS Contract by checking a box agreeing to its terms. Plaintiff claims that, by setting up 95 accounts and sending its marketing e-messages through those accounts, Defendant breached the terms of the TOS Contract. Furthermore, due to modified terms of the TOS Contract, Plaintiff contends that Defendant must pay $50 for each of its e-messages that were sent after March 17, 2006.

1.    *Breach of the TOS Contract*

It is undisputed that Defendant's e-messages were sent between January 2006 and May 2006. (Ballon Decl., Tab 8, Fowler Depo., 168:1-15.) During that time, the TOS Contract was modified three times. (Ballon Decl., Tab 2, Boster Decl., ¶¶ 3-6.) All four versions of the TOS Contract contain the following provision: MySpace is "for the personal use of Members only and may not be used in connection with any commercial endeavors except those that are specifically endorsed or approved by the management of MySpace.com. (Ballon Decl., Tab 2, Exhs. A-D.) Also, each version prohibits: (1) content that involves the transmission of 'junk mail,' 'chain letters," or unsolicited mass mailing or 'spamming;' and (2) "any automated use of the system, such as using scripts to add friends." *Id.*

Based on the evidence and analysis discussed in Section III.A above, the Court finds that Defendant used a script to transmit an unsolicited mass mailing to MySpace users for purposes of an unapproved commercial endeavor. This activity violates the terms of the TOS Contract.

Defendant argues that the TOS Contract, as a whole, is entirely unenforceable because every relevant version is a contract of adhesion, such that the terms are unconscionable. This argument is not well-taken.

The doctrine of unconscionability provides that a contract is unenforceable if it is both procedurally and substantively unconscionable. *A&M Produce Co. v. FMC Corp.*, 135 Cal App. 3d 473, 485-486 (1982). Procedural unconscionability focuses on oppression and surprise due to unequal bargaining power.[8] *Trend Homes, Inc. v. Superior Court.* 131 Cal. App. 4th 950, 957-58 (2005). "Oppression" arises from the inequality of the parties' bargaining power and an absence of real negotiation or a meaningful choice on the weaker party's part. *Id.* at 958. "Surprise" is found when "the terms to which the party supposedly agreed [are] hidden in a prolix printed form drafted by the party seeking to enforce them." *Id.* (citations omitted). A contract is substantively unconscionable when its terms are so harsh, oppressive, or one-sided as to shock the conscience. *Id.* at 961.

A review of the TOS Contract shows that it is, in fact, a standardized contract that gives the subscribing party only the opportunity to adhere to the contract or reject it. (*See* Ballon Decl., Tab 2, Exhs. A-D.) However, the facts indicate that Defendant had a reasonable alternative or meaningful choice in the matter, in that marketing through MySpace using the method employed was not its only choice. *See Freeman v. Wal-Mart Stores, Inc.*, 111 Cal. App. 4th 660, 668-669 (2003). In fact, Plaintiff's evidence shows that Defendant had, in fact, considered purchasing advertising space on the MySpace

---

[8] Folded into this analysis is the determination of whether the contract is adhesive. Procedural unconscionability is typically found where there is a contract of adhesion. While an alternative method of analysis calls for an initial determination of whether the contract at issue is adhesive, that determination, by itself, has no legal consequence for purposes of deciding whether a contract is enforceable. The true determining factor is whether the contract is unconscionable. *See Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807 (1981).

website. (Ballon Decl., Tab 10, Mobley Depo., 44:19-47:7.) Moreover, the Court finds that the contract is not written prolixly, particularly for an experienced, sophisticated business entity whose area of expertise involves Internet related technology. Even if the TOS contract was procedurally unconscionable, the terms, as a whole, are certainly not so harsh, oppressive, or one-sided as to shock the conscience.

In light of the above, the Court finds that Defendant breached the TOS Contract.

### 2.   *Liquidated Damages Provision*

On March 17, 2006, Plaintiff modified the TOS Contract and included the following provision: "Prohibited activity includes . . . advertising to, or solicitation of, any Member to buy or sell any products or services through the Services. If you breach this Agreement and send unsolicited bulk email, . . . or other unsolicited communications of any kind . . . As a reasonable estimation of such harm, you agree to pay MySpace.com $50 for each such unsolicited email . . . you send through the Services; . . .." *Id.*

Plaintiff asserts that, under this provision, Defendant is liable for liquidated damages in the amount of $50 per message sent after March 17, 2006. Defendant argues that the $50 liquidated damages clause is unenforceable because it is an impermissible contractual penalty. The Court disagrees.

California law provides that liquidated damages clauses are enforceable where: (1) damages from a breach would be impracticable or extremely difficult to determine with certainty; and (2) the amount represents a reasonable estimation of what such damages might be. *Utility Consumers' Action Network, Inc. v. AT&T Broadband of Southern California,* 135 Cal. App. 4th 1023, 1029 (2006). As stated above, the Court has found that Defendant breached the TOS Agreement by bulk transmission of unapproved, unsolicited commercial e-messages. The costs associated with this activity include not only infrastructure costs, such as additional bandwidth, and monitoring costs, they are also rife with large hidden costs. Such hidden costs include those associated with deterrence (legal fees, software, etc.), depletion of customer goodwill, and liability implications associated with the unlawfully advertised product. Therefore, the damages related to Defendant's breach are, in fact, impracticable or extremely difficult to determine. As to the amount of liquidated damages, CAN-SPAM sets statutory damages for unsolicited commercial emails at $25-$300 per message. Moreover, while the costs associated with spamming are difficult to definitively assess, the costs listed above are certainly large, and only the tip the iceberg. Therefore, the Court finds $50 per message a reasonable estimation of Plaintiff's damages.

Defendant further argues that, even if the Court finds the liquidated provision enforceable, the provision should be applied only to those messages that were sent from accounts created after March 17, 2006. Plaintiff contends that, because the TOS contract specifically provides for modification of the agreement, the provision should apply to all messages sent after March 17, 2006, regardless of when the account was created. The Court agrees with Plaintiff.

All four versions of the TOS Contract specifically provide: "MySpace.com may modify this Agreement from time to time and such modification shall be effective upon posting by MySpace.com on the Website. *You agree to be bound to any changes to this Agreement when you use the Service after any such modification is posted.* (Ballon Decl., Tab 2, Exhs. A-D (emphasis added).) For the same reasons stated above, this contractual term is neither procedurally nor substantively unconscionable. Additionally, the Court notes that Defendant created all 95 MySpace accounts, both before and after

March 17, 2006. Therefore, at the time it created its post-March 17 accounts, it knew, or should have known, that all messages, even those sent from pre-March 17 accounts, were subject to the liquidated damages provision. As such, the Court finds that the liquidated damages provision contained in the March 17, 2006 TOS Contract applies to all messages sent by Defendant after March 17, 2006.

## IV.    EVIDENTIARY OBJECTIONS

To the extent this Court has relied on evidence to which the parties object, those objections are overruled.

## V.    CONCLUSION

In light of the foregoing, Defendant's Motion for Partial Summary Judgment is **denied**, and Plaintiff's Motion for Partial Summary Judgment is **granted in part**. Specifically, the Court finds summary judgment in favor of Plaintiff as to the following:

(1)    Count I: Violation of 15 U.S.C. §§ 7704(a)(1), 7704(a)(5) and 7704(b)(1)(A)(ii);
(2)    Count III: Violation of Section 1729.5;
(3)    Count VI: Breach of Contract; and
(4)    Liquidated Damages of $50 per e-message sent after March 17, 2006.

The Court finds a triable issue of fact as to Plaintiff's claim that Defendant violated 15 U.S.C. § 7704(a)(2).

**IT IS SO ORDERED.**

Initials of Preparer                      s/w

Pike & Fischer Internet Law & Regulation | Search Results                    Page 1 of 3
Case 1:07-cv-00391-JJF    Document 4-8    Filed 06/19/2007    Page 13 of 16

Printer Format        Email to a Colleague                                    Close window

© 2007, IOMA, Inc.,  Published by Pike & Fischer

## Unsolicited MySpace E-Messages from Bogus Accounts Violated Federal, State Spam Laws

### June 4, 2007

Social networking site operator MySpace, Inc. announced May 31 the settlement of spam and breach of contract claims against a marketer that used MySpace.com's internal messaging system to deliver its advertisements. **MySpace, Inc. v. TheGlobe.com, Inc. (Settlement),** 2007 ILRWeb (P&F) 1303 **[CD Cal, 2007].**

The settlement was preceded by an unpublished court ruling in late February that resolved several issues of first impression involving the federal CAN-SPAM Act, California's anti-spam statute, and liquidated damages called for by MySpace.com's terms of service agreement.

First, the U.S. District Court for the Central District of California held that "e-messages" sent between MySpace.com account holders qualify as e-mail under state and federal CAN-SPAM Act and California's anti-spam statute as well.

Second, the court held that MySpace.com was an "Internet access provider" eligible to invoke the CAN-SPAM Act's civil remedies.

Third, the court ruled that the terms of service, which called for liquidated damages of $50 per unauthorized commercial e-message to MySpace users, was enforceable.

The terms of the settlement were not disclosed.

The settlement follows a recent ruling in *Facebook, Inc. v. ConnectU LLC* (2007 ILRWeb (P&F) 1861, No. 07-01389, ND Cal (2007), in which the *Facebook* court held that harvesting e-mail addresses from a social networking site likely violates provisions of the California penal code, and may constitute appropriation. That court rejected various spam claims, however, finding a dearth of evidence showing deception in defendant's actual sending of e-mail, not just in its collection of addresses.

**Unsolicited MySpace Messages.** Throughout the early part of 2006, defendant The Globe opened at least 95 MySpace accounts on the plaintiff's MySpace web site. The defendant obtained its accounts by providing the plaintiff with falsified and fraudulent information about its identity.

MySpace allows account holders to communicate with one another through "e-messages": e-mail-like communications that can only be sent and received within the MySpace framework.

Working through its various accounts, the defendant sent a total of 399,481 unsolicited "e-messages" to other users, all of which advertised the defendant's products.

MySpace sued, alleging violations of the 2003 Controlling the Assault of Non-Solicited Pornography and Marketing Act, 15 USC §§ 7701 *et seq.*, California Business and Professional Code §17925.5, and common law contract provisions.

**MySpace Meets Standing Criteria.** The CAN-SPAM Act prohibits the transmission of unsolicited e-mail messages that, among other things, contain false or misleading information in the headers or subject lines; that omit identifying information or information informing recipients of the ability to opt-out; and that generate and send messages using automated means.

The defendant first challenged MySpace's standing, and alternatively argued that the act did not apply to the e-messages in question. Judge R. Gary Klausner disagreed on both counts.

To bring an action under the CAN-SPAM Act, an entity must be an "Internet access provider," which the court interpreted to cover "traditional Internet Service Providers ('ISPs'), any e-mail provider, and even most Website owners." MySpace thus qualified, the court reasoned.

The court also determined that MySpace's e-messages qualified as e-mail for purposes of the CAN-SPAM Act.

The CAN-SPAM Act defines "e-mail message" as "a message sent to a unique electronic mail address," 15 USC §7702(6), which in turn is defined as "a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox . . . and a reference to an Internet domain." The court said that the e-messages here, though not sent through a standard ISP and confined to the "walled garden" of MySpace, nonetheless qualified for the act's protection. Congress intended to address even this more simplistic mode of messaging with CAN-SPAM, the court reasoned.

**Three Untriable Issues.** MySpace alleged four violations of the CAN-SPAM Act, and the court deemed three—those relating to e-message headers, notice, and automated generation—so clearly in favor of MySpace that it said there were no triable issues.

First, the court said, the defendant violated §7704(a)(1), which prohibits the transmission of commercial e-mail that contains false or misleading header information.

Here, the defendant's accounts were established with falsified names and identifying information, and none of the subsequent e-messages identified the true sender.

Second, the court said that the defendant's failure to include clear notice that recipients could decline receipt or "opt out" of future mailings constituted a violation of §7704(a)(5). The court said that each one of the 399,481 messages included deficient notice, which satisfied the statute's requirement of a "pattern or practice" of the offense.

Third, the court held that the defendant's practice of using an automated "script" to send its solicitations MySpace users was a violation of §7704(b)(1)'s provision against automated sending. That the defendant pre-selected ranges of MySpace IDs to target did not change the fact that the messages themselves were sent through automated means in violation of the statute, the court said.

The court left the issue of the messages' subject lines open for trial. Section 7704(a)(2) prohibits the "pattern or practice" of sending e-mails with materially false or misleading subject lines. Some of the defendant's subject lines were clearly false and misleading, the court said, but since not all of them were, more evidence would be needed to determine if the violations constituted a "pattern or practice."

**California Location, California Violation.** The court said that because MySpace's servers are located in California, all e-messages sent and received travel through California. Accordingly, it found no triable issue as related to the defendant's liability under Cal. Bus. Code §17529.5.

Section §17529.5 prohibits the transmission of e-mail with fraudulent or misleading subject or header information to or from any California e-mail addresses.

"Every time a user logs on to send, review, or reply to an e-message, he or she is doing so by accessing the California servers," the court reasoned. The court relied on its CAN-SPAM determinations of false and misleading headers and some subjects, and held that the state statute here had been violated.

**User Contract Applied; Damages Reasonable.** MySpace also claimed that the defendant's unsolicited messages violated its user agreement, to which all account holders must agree. The court agreed that the defendant was liable, and determined that liquidated damages were an appropriate and reasonable remedy.

MySpace's user contract explicitly prohibits the use of e-messaging for commercial purposes, the court said.

The court rejected the defendant's contention that the contract was an unconscionable contract of adhesion. It was a binding, take-it-or-leave-it contract, the court said, but it highlighted the defendant's options. "Defendant had a reasonable alternative or meaningful choice in the matter, in that marketing through MySpace using the method employed was not its only choice . . . Defendant had, in fact, considered purchasing advertising space on MySpace," the court said.

Moreover, the court said that the contract was not one-sided, and would not shock the conscience—especially not the conscience of an "experienced, sophisticated business entity whose area of expertise involves Internet related technology," as the court styled the defendant.

The court said also that the damages MySpace sought to impose—liquidated at $50 per e-mail sent after March 17, 2006—were reasonable. March 17, the court said, was when MySpace updated its user agreement to provide for liquidated damages.

The court said that MySpace's actual damages here would be "impracticable or extremely difficult to determine." Accordingly, it held liquidated damages permissible as the best way to compensate MySpace.

The court cited MySpace's user agreement, which provides that MySpace may modify the agreement "at any time," in dismissing the defendant's contention that the liquidated damages modification was invalid. The defendant was on notice, and should have known of the change, the court said.

Copyright © 2007 IOMA, Inc. — published by Pike & Fischer, a BNA Company

Printer Format

Close window

© 2007, IOMA, Inc.,
Published by Pike & Fischer

» C

Printer Format          Email to a Colleague                                Close window

© 2007, IOMA, Inc.,  Published by Pike & Fischer

**MySpace, Inc.**
**v.**
**TheGlobe.com, Inc.**
**(Settlement)**

**United States District Court,**
**Central District of California**

**February 28, 2007**

**2007 ILRWeb (P&F) 1303**

**No. CV 06-3391**

*(Editor's Note: A PDF version of this document is available at*
*<http://www.ilrweb.com/pfdocuments/ilrpdfs/myspace_v_theglobecom_settlement.pdf>.)*

HIDE DIGESTS

**[IC 4] Unsolicited MySpace e-messages from bogus accounts violated federal, state spam laws.**

Social networking site operator MySpace, Inc. announced the settlement of spam and breach of contract claims against a marketer that used MySpace.com's internal messaging system to deliver its advertisements. — **MySpace, Inc. v. TheGlobe.com, Inc. (Settlement), 2007 ILRWeb (P&F) 1303 [CD Cal, 2007].**

———————

Printer Format                                              Close window

© 2007, IOMA, Inc.,
Published by Pike & Fischer

» C